KAREN SPIKE, Plaintiff-Appellee, *v.* A. J. SELLETT, M. D., Defendant-Appellant.

Third District    No. 81-197

Opinion filed December 22, 1981.

Lyle W. Allen and David R. Sinn, both of Heyl, Royster, Voelker & Allen, of Peoria, for appellant.

Edward R. Durree, of Strodel, Kingery & Durree, of Peoria, for appellee.

JUSTICE STOUDER delivered the opinion of the court:

Plaintiff Karen Spike filed a four-count complaint to recover damages allegedly occasioned by the negligence of defendant A. J. Sellett, M.D. After a jury trial in the circuit court of La Salle County, the court entered judgment on a verdict in plaintiff's favor.

Necessary to an understanding of the issue herein is a rather extensive recitation of the evidence adduced at trial. In the late winter of 1976, plaintiff became pregnant and selected defendant as her physician. Defendant, while a general practitioner, had completed his residency in obstetrics and pediatrics, and had delivered approximately 6,000 babies in his career. During the first seven months of plaintiff's term, no complications arose.

On October 24, 1976, plaintiff awoke feeling nauseous. As the day progressed, she began vomiting and experienced the onset of severe pain beginning in her right abdomen and radiating down into the upper part of her leg. Plaintiff went to St. Margaret's Hospital in Spring Valley and was seen by a physician who ordered an enema and medicine to control the nausea. When her problems persisted after her return home, she went to St. Mary's Hospital in La Salle and was seen by defendant's brother, Dr. L. V. Sellett. Plaintiff told Dr. Sellett of her nausea and vomiting, and described her sensations as more cramp-like than generalized pain. She also stated that she had had a bloody show, which may indicate the onset of labor, the previous evening. Dr. Sellett diagnosed plaintiff pregnant with acute gastritis, admitted her to the hospital, and ordered a blood test. Defendant then came to the hospital to examine his patient. He discovered mild uterine contractions, a partially phased cervix, and he could feel the head of the fetus. Plaintiff complained of pain in her lower right abdomen but no point tenderness was present. The blood test revealed a white count of 12,200, essentially normal for the third trimester of pregnancy. Defendant diagnosed the problem as extreme gastroenteritis and did not order an X ray because of the danger this posed to the unborn child.

The symptoms continued intermittently throughout the evening and into the morning of October 25. By 1:30 a.m., plaintiff was moaning, crying and complaining of severe intermittent pain. Suspecting the onset

of labor, Nurse Patty Dominy requested an obstetric nurse. Nurse Kathy Kohr examined plaintiff and found no dilation of her cervix. Defendant was contacted twice that morning by Nurse Dominy and prescribed some Demerol for the pain. At 7 a.m., he again examined his patient and transferred her to the obstetric ward, where plaintiff was examined by the head obstetric nurse, Dorethy Kisiazkiewicz. Another blood test revealed a white count of 14,400 with a shift to the left, which defendant attributed to dehydration. At 12:30 p.m., plaintiff's vital signs were normal. She was relaxing and falling asleep by the early afternoon, when she pulled out her IV exclaiming, "I have had enough of that." Plaintiff continued to have irregular uterine contractions throughout the day and by evening was feeling better, eating, and showering. The parties discussed the possibility of plaintiff going home, but the pain and vomiting returned by late evening. During this day, defendant examined plaintiff five or six times, last checking his patient at 11:30 p.m. before he went home.

At 2 a.m. on October 26, plaintiff was moaning, restless, and unable to sleep. Her parents had Nurse Kohr call defendant, who returned to the hospital. Plaintiff's father demanded an operation. When defendant explained it would be necessary to call in from out of town surgical nurses, an associate surgeon, and others, Mr. Spike replied, "I don't care how many doctors you get, do something for her now or I am taking her." He further stated that "it did not make any difference about the baby."

Plaintiff was surgically opened shortly after 3 a.m. and purulent material, with an odor which indicated it came from the bowel, was discovered. From this defendant knew there was a rupture of the bowel, and likely of the appendix. It was the judgment of defendant that to remove the appendix without first removing the baby by caesarean section would have resulted in a dead fetus before plaintiff was even removed from the operating table. Defendant brought the entire uterus outside the abdomen, and the ruptured appendix, unexpectedly located directly beneath the area where the child's head had been, was first visualized. It was removed, the abdomen was cleansed, drains were inserted, and the patient was placed on intensive antibiotic therapy. White counts before her November 9 discharge ranged from 12,100 to 21,700. The baby was healthy and older than expected at the time of delivery.

On November 25, plaintiff was readmitted to St. Mary's with a recurrence of lower abdominal pain, which defendant treated with intravenous antibiotics. Plaintiff's parents, seven hours later, had her transferred to University Hospital in Iowa City, Iowa. Plaintiff was there treated by the chief resident in charge of obstetric services, Dr. Norman Diebel. Plaintiff's white count was elevated to 22,500 and the initial diagnosis was peritonitis with pelvic abscess, secondary to the prior operation. A pelvic examination confirmed a 14-centimeter mass poorly

separable from the uterus. Plaintiff was again treated with antibiotic therapy, as her surgeons all agreed surgery was unnecessary. By December 3, she was feeling well, with no vomiting, nausea, or fever. Upon her discharge two days later she was instructed to return in four weeks and to telephone if she had any pain, fever, nausea, or vomiting. As upon her previous discharge from St. Mary's, plaintiff was given a prescription for an antibiotic. While she claimed at trial she was diligent in her antibiotic therapy, her first prescription was not filled until eight days after her initial discharge, and the record suggests the second prescription may never have been filled. Plaintiff never returned to, nor called, Iowa City.

On December 8, plaintiff was again afflicted with abdominal pain and was admitted to Rockford Memorial Hospital by Dr. Ronald Burmeister. His subsequent examination revealed two masses, one 12 centimeters and the other 5 centimeters. On December 10, without consulting with anyone at University Hospital, Dr. Burmeister removed plaintiff's uterus, both ovaries and both fallopian tubes. An anaerobic culture of an abscess taken as soon as the abdomen was opened revealed no anaerobic growth in 48 hours. A culture taken from tubo-ovarian abscesses revealed the presence of four types of bacteria. The uterus showed a minor stitch infection on its outer surface but no gross infection within the organ itself.

■■ The elements necessary to establish medical malpractice are the same as in any negligence action. A plaintiff must prove that a defendant owed him a duty, which was breached or not performed, proximately causing injury, resulting in damages. A plaintiff must also prove that he was in the exercise of ordinary care and caution for his own safety. (*Borowski v. Von Solbrig* (1973), 14 Ill. App. 3d 672, 303 N.E.2d 146, *aff'd* (1975), 60 Ill. 2d 418, 328 N.E.2d 301.) The element of duty, or standard of care as it is more commonly expressed, must be, with exceptions not here relevant, established by expert testimony. (*Walski v. Tiesenga* (1978), 72 Ill. 2d 249, 381 N.E.2d 279.) A plaintiff must then prove that, in light of this standard, the doctor was unskillful or negligent and that his want of skill or care caused the injury to the plaintiff. *Walski v. Tiesenga.*

Proof that a good result was not achieved is not proof of a breach of a physician's duty. A plaintiff must demonstrate what the average, reasonable physician in good standing, practicing in the same or a similar community or hospital, would have done in a similar case. Proof of a bad result or a mishap is no evidence of lack of skill or negligence. If a doctor has given a plaintiff the benefit of his best judgment, assuming that judgment to be equal to that ordinarily used by reasonably well-qualified doctors in similar cases, he is not liable for negligence, even if that judgment is erroneous. *Borowski v. Von Solbrig* (1973), 14 Ill. App. 3d 672, 303 N.E.2d 146, *aff'd* (1975), 60 Ill. 2d 418, 328 N.E.2d 301.

■■ The four counts of plaintiff's complaint allege that defendant was

negligent in his diagnosis and treatment of appendicitis, in performing the caesarean section, and in his postoperative care. Considering first the diagnosis and treatment of appendicitis, every expert to testify on the subject agreed that in one of every five cases of appendicitis in pregnant women, the diagnosis cannot be made until after the organ has ruptured. Defendant's expert, Dr. John Long, a board-certified obstetrician and professor of obstetrics and gynecology at Rush Medical College, characterized the diagnosis of appendicitis in pregnant women as "the hardest diagnosis to make in the practice of obstetrics." It is fortunate that the illness only occurs once in every 1,200 to 2,000 pregnancies, because pregnancy masks its symptoms. While every expert agreed this is true, we note that plaintiff's expert Dr. Ronald Burmeister, the board-certified obstetrician and gynecologist who removed plaintiff's reproductive organs, admitted that the pain which plaintiff experienced can also be a symptom of "renal stone, an infection in the kidney, a gallbladder problem, a twisted ovary, an obstruction of the bowel in which the bowel is twisted on itself, or it could be an obstetrical complication, such as a separation of the uterus, called an abruptio placentae." Defendant testified that he considered the possibility of appendicitis, bowel obstruction, gallbladder, peptic ulcer, abruptio placentae, tortion or infarction of an ovarian cyst, pyelonephritis and other disorders. No expert disagreed that nausea, vomiting, and an elevated white count with a shift to the left may be diagnostic only of pregnancy. Under these circumstances, we cannot characterize defendant's exercise of judgment as negligent.

Considering next the performance of the caesarean section, it would appear that this was the issue upon which the case turned. When plaintiff's appendix ruptured, releasing the purulent material into the abdomen, she developed peritonitis from the bacterial release. Her later complications apparently stemmed from the presence of these bacteria, which evidently entered the reproductive tract as a result of the caesarean.

Two factors must here be considered. The first concerns the presence of obstetric indications that a caesarean section was necessary. Plaintiff's experts testified that absent such indications, the procedure is inappropriate when an appendix has ruptured. Dr. Long testified that obstetric indications are not necessary, but the record reflects no substantial disagreement with the proposition that, if possible, a caesarean should be avoided in the presence of local or generalized infection within the peritoneal cavity. While the experts disagreed as to whether specific obstetric indications were present, plaintiff had a bloody show, uterine contractions, and a phased cervix. All experts agreed that in determining whether there is an obstetric reason to perform the procedure, it is a question of judgment on the part of the surgeon.

The second factor to be here considered is the effect of the medical

judgment on the fetus. While not passing on the morality of the matter, we note its influence on the judgments and opinions herein. It was the opinion of defendant that an appendectomy without a previous caesarean section would have resulted in a dead fetus before plaintiff left the operating table. He considered both the 90 percent infant mortality rate in this situation as well as the 10 percent to 17 percent of mothers who die from ruptured appendix and peritonitis. Dr. Burmeister recognized these risks:

> "With regard to the pregnancy, then we have to take the risk that the patient might go into labor. That she might deliver the baby prematurely vaginally. That she might even lose the baby because of the severity [sic] toxicity that the baby might die in uteral. But we have tried to prevent the possibility of increasing the infectious risk to the patient by not opening the uterus. The risk of developing abscesses after the appendix is ruptured without the uterus being opened is much less than if the uterus is opened and therefore, even if the baby were to die, we could say that probably, in all medical probability, this patient would be able to conceive again and have another baby."

Defendant testified that to have performed the appendectomy without the prior caesarean would have required an incision from the pubis to the chest, and considerable manipulation of the uterus to gain access to, and visualization of, the appendix, which was under the baby's head. This he believed would have resulted in the death of the fetus. Both defendant and his brother, who assisted in the operation, agreed the prior caesarean was necessary. There was arguably evidence of obstetric indications and definite indications in the judgment of defendant. While the procedure should have been avoided, if possible, it was defendant's judgment that it was not possible if the fetus' life was to be preserved. Under these circumstances we do not find defendant's exercise of judgment to be negligent.

Considering last the matter of postoperative care, this issue was one of the sufficiency of antibiotic therapy. After surgery, plaintiff was treated with intravenous ampicillin and intramuscular terramycin. Defendant then prescribed 500 milligrams of ampicillin every four hours and 100 milligrams of terramycin first every eight hours and later every 12 hours. Sumycin was also prescribed. After an antibiotic sensitivity test revealed that the peritonitis had been caused by an E. coli infection, defendant prescribed 150 milligrams of cleosin four times a day. Upon her later discharge from University Hospital, Dr. Diebel prescribed 500 milligrams of tetracycline four times a day for three weeks. As indicated earlier, it is questionable whether plaintiff was responsible in following these regimens.

Dr. Burmeister testified that the amount of antibiotics was less than

optimal, the routes were inappropriately administered, and the wrong antibiotic was in one case prescribed. Dr. Diebel, who stated that plaintiff was in no need of surgery, particularly not a hysterectomy, when discharged from his care, testified that defendant's choice of antibiotic treatment was reasonable. Dr. Long and Dr. Russell Simonetta agreed with defendant's treatment. Dr. Edward Fesco found it to be excellent. Again we find no basis to characterize defendant's judgment as negligent.

In each of the areas where we have found no negligence, defendant gave plaintiff his best judgment. While an unfortunate result here obtained, this is insufficient to establish defendant's negligence. Plaintiff has established that other physicians may have handled her case differently, but we find that a reasonably well-qualified doctor might well have proceeded in the same manner as defendant. We therefore do not reach the various procedural questions also presented in this cause. We believe under the application of the *Pedrick* rule the trial court should have directed a verdict at the close of the evidence or, failing to do so, it erred in failing to grant defendant's motion notwithstanding the verdict.

Accordingly, the judgment of the circuit court of La Salle County is reversed.

Reversed.

SCOTT, P. J., and HEIPLE, J., concur.