NANCY BROWN, Special Adm'x of the Estate of Mary Ann Conway, Plaintiff-Appellant, v. ATEF MOAWAD *et al.*, Defendants-Appellees.

First District (6th Division)   No. 1—89—1359

Opinion filed March 15, 1991.

518

McNAMARA, J., dissenting.

Goldberg & Goldberg and David A. Novoselsky & Associates, both of Chicago (Barth H. Goldberg, David A. Novoselsky, and Tammy A. Koester, of counsel), for appellant.

Pretzel & Stouffer, Chartered, of Chicago (Neil K. Quinn, Maryanne H. Capron, Robert Marc Chemers, and Michael G. Bruton, of counsel), for appellees.

PRESIDING JUSTICE RAKOWSKI delivered the opinion of the court:

Mary Ann Conway (the decedent) was admitted to the University of Chicago Hospital (Hospital) on July 21, 1978. At the time of her admission she was six days postpartum, and pursuant to hospital policy, she was admitted to the obstetrical and gynecological service. Her chief complaint on admission was severe back pain and shortness of breath. The following day, the decedent left the Hospital against medical advice and was admitted to Cook County Hospital, where she died several hours later. An autopsy revealed that the cause of death was a dissecting aortic aneurysm. The plaintiff, Nancy Brown, subsequently filed a complaint against the Hospital and certain doctors alleging that the medical treatment of the decedent on July 21 and 22, 1978, was below the standard of care and caused her death. Following a jury trial, a judgment was entered in favor of defendants. Plaintiff filed a motion for a new trial which the trial court denied. The issues plaintiff raises on appeal are: (1) whether it was reversible error for the trial court to allow inflammatory evidence to be improperly argued and brought to the attention of the jury; (2) whether plaintiff should be granted a new trial where defendants were allowed to present their entire case in chief during plaintiff's examination of adverse witnesses; (3) whether the trial court's denial of plaintiff's request for an Illinois Pattern Jury Instructions, Civil, No. 5.01 (2d ed. 1971) jury instruction was reversible error; (4) whether plaintiff should be granted a new trial because the jury was not comprised of a fair cross-section of the community; (5) whether the verdict was contrary to the manifest weight of the evidence; (6) whether defendants' expert gave an opinion on subject matter beyond his expertise; and (7) whether the trial court erred in permitting defense counsel to argue the cause of the decedent's death in his opening statement and closing argument.

At the trial, Dr. John Sholl, a fourth-year resident in obstetrics and gynecology, was called as a witness by plaintiff's counsel pursuant

to section 2—1102 of the Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 2—1102). He saw the decedent when she was first admitted. At that time she informed him that the back pain and shortness of breath had begun three hours earlier. Sholl noted that the decedent was agitated and in apparent distress. Her skin was cool and clammy and her color was poor. He described the decedent as an "hysteric" woman. Sholl examined the decedent and initiated a series of tests. As a result of his examination, Sholl listed pulmonary embolism, pancreatites, pyelonephritis and myocardial infarction as possible diagnoses. Because these conditions were being considered, Sholl requested a consultation from Dr. Alan Schwartz, a resident in internal medicine. According to Sholl's testimony, the decedent presented an unusual history for any disease. Schwartz also indicated that the final diagnosis might be hysteria, pulmonary embolism, myocardial infarction, gallbladder disease, pancreatites, myocardites or pericardites, but that the most likely diagnosis was pulmonary embolism. Sholl stated that he did not initially consider the possibility of a dissecting aneurysm because it was extremely rare. He further testified that, although the decedent always seemed to be in some pain, the degree of pain seemed to vary. He decided to medicate her with a sedative rather than pain medication because he did not want to mask her symptoms or interfere with her ability to communicate. Sholl left the hospital that evening around 7 p.m. When he returned to the Hospital the next morning, the decedent's family expressed dissatisfaction with the care she had received, and they informed Sholl that the decedent was leaving the hospital contrary to medical advice.

Dr. Kimberly Ann Johnson testified as an adverse witness that she was a first-year resident when she treated the decedent in Sholl's absence. The senior resident, Dr. Neil Angerman, and the attending physician, Dr. Atef Moawad, were also responsible for the decedent's treatment. At approximately 9:45 p.m., Johnson noted that the decedent was still complaining of severe back pain. After consulting with Dr. Schwartz and Dr. Angerman, Dr. Johnson ordered one dose of pain medication and sedative. At some point during the evening someone suggested the possibility of a dissecting aneurysm, but it was not considered as very likely because the decedent's only symptom was pain, and some of the test results which were generally abnormal where a dissecting aortic aneurysm was present were within normal limits in the decedent's case. However, despite this low probability, a consult was requested from Dr. James Schulak, a fourth-year resident in vascular surgery. Johnson testified that she monitored the decedent's vital signs during the night but didn't record them. She also

kept Dr. Angerman, the senior resident, informed of the decedent's condition. Sometime after midnight Dr. Johnson was called by the nursing staff because the decedent was extremely agitated and demanding pain medication. Johnson noted that the decedent had been complaining of severe pain since 5:30 p.m. the previous night, but that there was no apparent medical emergency to explain her symptoms. Because of the decedent's constant demand for pain medication, a drug screen was ordered to determine if she had taken illicit drugs. Dr. Johnson further testified that, although the decedent's illness had not been diagnosed by the time she left the Hospital, further tests had been ordered, and the decedent's decision to leave the Hospital delayed the diagnostic process by six or seven hours.

Dr. James Schulak testified as an adverse witness that when he first saw the decedent he did not think that she had a dissecting aneurysm because he found no physical findings to support the diagnosis. Her X rays and vital signs were normal, and her age was younger than was typical for the condition. Therefore, he did not believe that the diagnostic procedure known as an angiogram was indicated. Schulak added that he would have come to a different conclusion if the CBC blood test, which had been ordered for the next morning, was elevated.

Dr. Neil Angerman, the chief resident of obstetrics and gynecology during the relevant time period, was also called as an adverse witness. He testified that he first saw the decedent on the evening of July 21, 1978. At that time she was very agitated, in constant motion and repeatedly requesting pain medication. Angerman stated that he was the first to consider the possibility of a dissecting aortic aneurysm but he did not think the presence of this condition was likely in view of the negative history and diagnostic test results that had been obtained. Rather, Angerman believed that the decedent's symptoms were more consistent with gallbladder disease, and that even though her behavior was bizarre, he did not believe that she was psychotic. Angerman stated that he observed the decedent's vital signs several times and communicated with Dr. Johnson regarding her condition throughout the night. During this time he saw no evidence that she was experiencing a medical emergency.

Dr. Atef Moawad was the attending physician who was supervising the obstetrical service during the decedent's hospitalization. He testified as an adverse witness that he was aware of the fact that the decedent was experiencing severe pain which could have been attributable to several of the illnesses under consideration. He was also aware of her other symptoms such as her agitation and cool, clammy

skin. He stated that he considered her behavior bizarre but did not think hysteria was the sole source of her problems. According to Moawad, the decedent's condition was medically stable when he left the hospital at 6:30 p.m. on July 21, 1978. At that time, her vital signs, blood count, chest X ray and electrocardiogram were normal. Moawad stated that he did not expect the residents who were monitoring the decedent throughout the night to call him unless there was a change in her condition. He also added that he agreed with the decision to medicate the decedent with Demerol and Thorazine in an attempt to calm her until the source of her pain was determined rather than relieve her pain and mask her symptoms. Moawad testified that the decedent's death was caused by a rare disease.

Bonnie Hilliard was one of the nurses on the unit where the decedent was hospitalized. On the morning of July 22, 1978, she arrived at work at 7 a.m., and shortly thereafter she was advised that the decedent wanted to leave the hospital. Hilliard stated that she tried to convince the decedent and her family members who were at the hospital with her that she should not leave the hospital at that time because it would jeopardize her diagnosis and treatment. However, a short time later, Hilliard was notified that the decedent was leaving with her family.

Several members of the decedent's family testified that she appeared to be experiencing severe pain, but that the doctors told them that she was crazy and that there was nothing wrong with her. The plaintiff testified that none of the doctors explained why the decedent should not leave the hospital.

The decedent was taken from the Hospital by her parents and admitted to Cook County Hospital at around 10:15 on the morning of July 22, 1978. Dr. Marge Cohen, a senior resident, treated the decedent when she was admitted. She testified as an occurrence witness that the decedent appeared to be in severe pain but was cooperative. Her pulse and respiration rate were high, and the results of emergency blood tests were abnormal, indicating that the decedent's condition was deteriorating. Cohen also testified that she telephoned Dr. Sholl at the Hospital to determine what diagnostic tests had been performed and the subsequent results. According to Cohen, Sholl informed her that the source of the decedent's pain was psychological rather than organic. Cohen testified that, based on her observation of the decedent, she did not agree with Sholl's assessment. By 1 p.m. the decedent's condition had further deteriorated, and she was transferred to the intensive care unit, where she went into cardiac arrest. Despite several attempts to resuscitate her, the decedent died at 2:15

p.m. Following an autopsy, the cause of death was determined to be a dissecting aneurysm of the aorta. According to the testimony of the parties' experts, the autopsy report also revealed that the decedent had a congenital disease of the arteries known as cystic medial necrosis.

The plaintiff called four expert witnesses who testified regarding the quality of care provided by the defendant physicians. The first expert to testify was Dr. Edward Carney, a cardiovascular and thoracic surgeon. Carney testified that the care administered by Schulak, the thoracic surgery consultant, deviated from the recognized standard of care because he failed to perform the proper procedures to diagnose the aneurysm. According to Carney, the only procedure available in 1978 which would have definitively determined whether the decedent had a dissecting aneurysm was an aortogram. Although the procedure was invasive with some risk to the patient, the other medical conditions being considered, with the exception of hysteria, had been ruled out. Carney stated that Schulak's consultation note was inadequate, and that he should have recognized and communicated to the treating physicians that there was the possibility of a dissecting aneurysm and recommended an aortogram as the only means of diagnosing it. Carney also criticized Schulak for failing to interpret the decedent's pain as organic rather than hysterical in origin. Carney stated that these omissions contributed to the decedent's death. On cross-examination, Carney acknowledged that the autopsy of the decedent revealed the presence of a congenital condition known as cystic medial necrosis, a condition which weakened her blood vessels. Carney also agreed that none of the diagnostic procedures performed on the decedent suggested the presence of a dissecting aneurysm.

Dr. Scott Kale testified as an expert witness in internal medicine. He stated that the care provided by Dr. Schwartz was below the standard of care because he failed to recognize that the decedent's condition was not stable and failed to transfer her to a service where she could receive more direct care. He also criticized Schwartz for not ordering medication to relieve the decedent's pain which increased the risk of medical emergency. Kale also criticized Schwartz for formulating the diagnostic impression that the decedent was suffering from hysteria when he was only a second-year resident and had not had sufficient training or experience to differentiate between hysteria and a medical illness. Kale further testified that Schwartz should have communicated his diagnostic impressions with his supervisors. On cross-examination, Kale acknowledged that if the decedent had re-

mained at the Hospital the next day, it was possible that a diagnosis would have been made.

Dr. John Masterson was called by plaintiff as an expert in obstetrics and gynecology. He testified regarding the quality of care provided by Dr. Moawad, Dr. Sholl, Dr. Angerman and Dr. Johnson. He stated that all four of these physicians deviated from the standard of care, and this deviation caused or contributed to the decedent's death. He criticized Moawad for admitting the decedent to an obstetrical service, failing to evaluate her or transfer her to another service and failing to follow up on her condition. Masterson criticized Sholl for failing to consider the possibility of a dissecting aneurysm, failing to give the patient adequate pain medication, failing to arrange and participate in emergency consultations, failing to adequately advise the resident staff of the patient's condition and failing to confer with the attending physician. Angerman and Johnson were criticized for failing to adequately monitor the decedent's condition, failing to communicate with the attending and consulting physician and failing to treat the decedent's symptoms and provide pain relief. Contrary to the defendants' testimony, Masterson stated that the X ray of the decedent's heart which was taken on admission was abnormal. On cross-examination, Masterson acknowledged that diagnostic tests which were ordered for the morning of July 22, 1978, would have confirmed the diagnosis of dissecting aortic aneurysm and that it was a rare condition.

Plaintiff's fourth expert witness was Dr. Edward Portman. He testified that he graduated from medical school in 1967 and began a residency in obstetrics and gynecology at Vanderbilt University. After completing the first year of his residency, Portman spent two years in the Navy serving as a physician in obstetrics and gynecology. He then returned to Vanderbilt University and completed his residency as well as a fellowship in gynecologic oncology. Portman stated that he was "Board Certified," which meant that he was an "expert" in obstetrics and gynecology. He further testified that he began his private practice in 1972 and was licensed in Georgia, Wisconsin and Illinois.

Portman acknowledged, in response to counsel's question, that he had learned about aneurysms in medical school. He then presented testimony defining various medications classified as sedatives, tranquilizers and analgesics, as well as the possible postpartum complications.

Portman then testified as to the quality of care provided by Dr. Moawad, Dr. Sholl, Dr. Angerman, Dr. Schwartz and Dr. Schulak. Dr. Moawad was criticized for not seeing the decedent on admission, failing to transfer her to a medical service, failing to consider a dissect-

ing aneurysm as a possible diagnosis, failing to demand a psychiatric consult to rule out hysteria or psychosis and failing to further monitor the patient's condition. Portman criticized Sholl for failing to recognize the extent of the decedent's illness, failing to diagnose or list as a high priority the dissecting aortic aneurysm, admitting the decedent to an obstetrical service and failing to transfer her to a more appropriate service. Angerman was criticized for failing to recognize the seriousness of the decedent's condition, not transferring her off the obstetrical service, failing to recognize the symptoms of the dissecting aneurysm, failing to confer with Dr. Schulak, and failing to request a psychiatric consultation. Portman criticized Schulak for failing to recognize the decedent's acute condition, failing to obtain an adequate history and physical examination and failing to request a psychiatric consultation. Schwartz was criticized for failing to recognize the seriousness of the patient's condition, not conferring with the senior resident, failing to recognize a dissecting aneurysm as a possible diagnosis and failing to request a psychiatric consultation.

Portman testified that the decedent's death was not attributable to her signing out of the hospital against medical advice, and that her condition would have rapidly deteriorated the next day no matter where she was hospitalized. On cross-examination, Portman acknowledged the admission he made in his deposition testimony that he was not an expert in the diagnosis of a "dissecting aorta."

Dr. Lawrence Michaelis, chief of cardiothoracic surgery at Northwestern University Medical School, testified as an expert witness for defendants. He stated that dissecting aortic aneurysms are very uncommon in women under the age of 40. He also stated that the diagnosis of dissecting aortic aneurysm was missed because the symptoms resemble other diseases, and there are usually other symptoms in addition to pain, such as a decrease in the patient's red blood cells. He did not believe Dr. Schulak's failure to order an aortogram was a deviation from the standard of care because the patient's condition was stable at that time, and the procedure was too risky to warrant it. Michaelis stated that cystic medial necrosis, the disease discovered during the autopsy of the decedent, is a congenital disease which weakens the artery wall, and that this condition decreased the decedent's chances of long-term survival. He further testified that the decedent died as a result of leaving the Hospital against medical advice because the appropriate tests could not be performed, and the physical activity involved in going to another hospital may have hurt her.

Plaintiff first contends that she is entitled to a new trial because the trial court allowed inflammatory evidence to be improperly argued

and brought to the attention of the jury. Plaintiff claims that the statements were not only improper because they were prejudicial but also because they were in opposition to the court's previous order granting plaintiff's motion *in limine*. Plaintiff initially brought a motion *in limine* to prohibit reference to Dr. Portman's prior experience performing abortions. The trial court granted plaintiff's motion with the reservation that its ruling might be reviewed after Dr. Portman testified.

At the trial, Dr. Portman testified that Drs. Moawad, Sholl, Angerman, Schwartz and Schulak deviated from the acceptable standard of care, and that the decedent died as a result of their negligence. Prior to cross-examination of plaintiff's expert, defense counsel asked the court to reconsider its prior ruling on the motion *in limine*. Defense counsel argued that plaintiff's expert, who was a gynecologist, had testified that Dr. Schulak, a thoracic surgeon, had deviated from the standard of care, and no evidence had been presented regarding the expert's professional experience after he completed his formal medical training in 1972. The trial court modified its prior ruling so that the jury could hear further testimony regarding the expert's professional experience. However, defense counsel was limited to one question pertaining to each facility where Portman had practiced, and defense counsel was also instructed to avoid use of the term "abortion" and substitute "termination of pregnancy" in its place. The trial court also allowed plaintiff's counsel to confer with the witness in order to advise him of the change in the court's ruling and to prepare him for cross-examination. However, when Dr. Portman was questioned regarding the nature of his work at the various clinics, he replied that "it was office gynecology, family planning, reproductive control, first trimester abortion procedure."

■ Although plaintiff first argues that defense counsel was allowed to refer to Dr. Portman's performance of abortions during cross-examination, the evidence in the record does not support this argument. On cross-examination, defense counsel, in compliance with the trial court's instructions, asked Portman only one question regarding the nature of his practice at each of the treatment facilities with which he had been associated from 1975 to 1989. Also, in accordance with the court's instructions, defense counsel did not use the term "abortion" in the questions presented. Rather, it was Portman himself who used the term in the context of describing his practice at the various clinics. This occurred even though the trial court had given plaintiff's counsel additional opportunity to prepare the witness for cross-

examination in order to avoid the use of the term abortion in the jury's presence.

We also note that on direct examination Portman presented no testimony regarding his professional experience after the completion of his residency and fellowship in 1972 except for the fact that he was licensed to practice in several States. Therefore, no evidence was presented regarding the nature of Portman's professional practice over the next 15 to 17 years. Furthermore, although the training and experience that Portman did identify was in the medical speciality of obstetrics and gynecology, he testified as to the standard of care in the highly specialized field of vascular surgery. Consequently, rather than permitting an improper cross-examination, the trial court may have been *too restrictive* in allowing only four questions regarding Portman's professional experience over a period of 15 years. In *Sears v. Rutihauser* (1984), 102 Ill. 2d 402, 466 N.E.2d 210, the court addressed the special circumstances surrounding the testimony of a medical expert in a personal injury trial. The court stated that because characteristics of the medical condition at issue were often beyond the knowledge of the average person, the jury had to rely on the testimony of the medical experts in reaching a verdict. The court also characterized the expert's opinion as one which " 'has the sanction of an oath but lacks the substantial safeguard of truth applied to testimony concerning facts observed by a witness which is afforded by the criminal law since the opinion is the result of reasoning, and no one can be prosecuted for defective mental processes.' " (*Sears*, 102 Ill. 2d at 407 quoting *Opp v. Pryor* (1920), 294 Ill. 538, 545.) Because cross-examination is the principal safeguard against errant expert testimony (see *Sears*, 102 Ill. 2d at 407), defense counsel's cross-examination of Portman was not improper.

■ At closing argument, defense counsel made the following statements:

> "And let me just tell you about the people who came in here to make criticisms. Dr. Portman who had never seen a dissection of an aneurism [*sic*] in his practice, who had never treated a patient with the dissection of the aorta, who of the last six years of the last fifteen or ten had spent the greater majority of his time in those years doing first trimester abortions, doing those things that interrupt pregnancy during the first five months.
>
>           * * *
>
> Dr. Portman said that he was in Macon, Georgia; and he had a clinic doing that type of work; and that he was in Wis-

consin. And he had a clinic, and he was doing that type of work. And that he came to Chicago and he opened up a clinic for one month and closed it. That's the gentleman who is going to make a criticism of the vascular surgeon and what the vascular surgeon saw and did."

Plaintiff argues that she was prejudiced by these statements because they were inflammatory and contrary to Dr. Portman's testimony. However, in closing argument, counsel is entitled and allowed broad latitude to argue the evidence and the reasonable inferences which may be drawn from it. (*Sloan v. O'Dell* (1987), 159 Ill. App. 3d 268, 273, 512 N.E.2d 105; *Webb v. Angell* (1987), 155 Ill. App. 3d 848, 853, 508 N.E.2d 508.) The proper scope of argument is for the trial court to determine, and unless the court has abused its discretion, its determination will not be reversed. *Dotson v. Sears, Roebuck & Co.* (1987), 157 Ill. App. 3d 1036, 1043, 510 N.E.2d 1208.

■ In this case, there was nothing improper in defense counsel's statement that Portman performed abortions where Portman himself testified to this fact on cross-examination. However, counsel's statement that in the last six years, Portman "spent the greater majority of his time in those years doing first trimester abortions" was not supported by the record. Thus, we conclude that this statement was improper. However, even if defense counsel's closing argument discredited plaintiff's expert in the eyes of the jury, plaintiff was not denied a fair trial where Portman's testimony was cumulative of that offered by the other three experts who testified on plaintiff's behalf. We also note that, because defense counsel was limited to one question regarding the nature of Dr. Portman's practice at each facility, he was unable to cross-examine Portman on what proportion of time he spent on each of the professional services provided. Finally, defense counsel's reference to Dr. Portman's performance of abortions came as no surprise to the jury, who had already heard Portman testify that his practice included the performance of first-trimester abortions.

Plaintiff relies on *Poole v. University of Chicago* (1989), 186 Ill. App. 3d 554, 542 N.E.2d 746, in support of her argument that the allowance of the allegedly improper cross-examination and closing argument was reversible error. In *Poole*, defense counsel asked plaintiff's expert whether he had been the subject of any medical disciplinary proceedings since 1977. When the expert responded that he had not been the subject of this proceeding, defense counsel produced a document dated November 1985 which reflected that a disciplinary charge against the witness was pending. Defense counsel then elicited affirmative responses from the witness that the document contained allega-

tions of incompetence. During closing argument, defense counsel called plaintiff's expert a liar and a prostitute and referred to the pending disciplinary proceeding which allegedly charged the witness with incompetence. We first note that *Poole* is distinguishable because the improper statements referring to the disciplinary charges against the witness were not relevant to medical testimony as they were in the instant case. *Poole*, 186 Ill. App. 3d at 561. See also *Underwood v. Pennsylvania R.R. Co.* (1966), 34 Ill. 2d 367, 215 N.E.2d 236.

In this case, defense counsel's cross-examination of Portman regarding the nature of his professional experience over a 15-year time period was very relevant to Portman's medical testimony where Portman, who was trained in obstetrics and gynecology, testified as to the standard of care in vascular surgery. In addition, there had been no testimony on direct examination regarding the nature of Portman's experience during this time period.

The comments made by the defense counsel in *Poole* during closing argument that plaintiff's expert was a prostitute and a liar were also far more inflammatory and unrelated to the facts of the case than the comments of defense counsel in this case. In addition, Portman himself acknowledged that he had performed abortions during his employment at several clinics. A final distinguishing factor in *Poole* was the fact that the expert witness who was the subject of the improper comments was the plaintiff's only medical expert, as opposed to the instant case where plaintiff had three other medical experts who presented testimony on the same subject matter found in Portman's testimony, and who were not discredited in the presence of the jury.

In conclusion, we note that when plaintiff's counsel called Portman to testify as a medical expert he knew what Portman's professional training and experience had been. When counsel offered Portman, whose medical specialty was obstetrics and gynecology, as an expert in vascular surgery counsel should have expected that opposing counsel would cross-examine Portman regarding his experience. This was even more probable where testimony regarding approximately 15 years of Portman's professional experience had been omitted from his direct examination. In summation, we conclude that the cross-examination of Portman was not improper and that any impropriety which occurred during closing argument was not reversible error.

■ Plaintiff next contends that she is entitled to a new trial because the trial court failed to limit the testimony of several defendants who were examined by the plaintiff as adverse witnesses. She

claims that because defendants volunteered information in response to plaintiff's counsel's questions, they were able to present their defense during her case. Plaintiff cites three instances where Dr. Schulak was nonresponsive to questions. In the first instance the trial court sustained plaintiff's objection and struck the relevant portion of the testimony, and in the second instance the witness answered plaintiff's question. The third instance cited by plaintiff was Dr. Schulak's response to defense counsel's question. Plaintiff also cites four instances where Dr. Johnson gave nonresponsive answers. In the first two instances the trial court granted plaintiff's motion to strike. In the third instance, Dr. Johnson started to respond to the question and was interrupted, and in the fourth instance the trial court allowed the witness to answer the question before making a determination as to whether it was responsive. However, when the witness completed her answer, plaintiff's counsel failed to renew his motion to strike.

Based on our review of the evidence, we conclude that the witnesses' answers were responsive to the questions, or the trial court sustained counsel's objections. Furthermore, assuming, *arguendo*, that defendants were able to present evidence during plaintiff's adverse examination, plaintiff has failed to show how she was prejudiced or how the outcome of the trial was affected by this alleged error. (*Holsapple v. Country Mutual Insurance Co.* (1983), 112 Ill. App. 3d 512, 518, 445 N.E.2d 909.) Plaintiff has also failed to cite any authority in support of her contention that defendants' conduct was improper.

Plaintiff also contends that she was prejudiced by the trial court's refusal to give her tendered jury instruction (Illinois Pattern Jury Instruction, Civil, No. 5.01 (2d ed. 1971)) (IPI Civil 2d No. 5.01), because the records of decedent's vital signs, which defendants failed to produce, were critical to the credibility of Dr. Sholl and Dr. Johnson. Both defendants testified that the decedent's vital signs were taken throughout the night, but were never recorded in decedent's hospital record. The explanation provided was that the sheet of paper on which the information was recorded was kept at the patient's bedside, and that a secretary transferred the information to the patient's record the next day. In this case, the decedent abruptly left the hospital the next morning, and her record was removed from the unit before the vital signs taken throughout the night could be recorded.

Giving IPI Civil 2d No. 5.01 is within the sound discretion of the trial court, and a new trial will only be granted for the trial court's denial of a tendered instruction where a party has shown that serious prejudice resulted. (*Schaffner v. Chicago & North Western*

*Transportation Co.* (1989), 129 Ill. 2d 1, 34, 541 N.E.2d 643; *Thompson v. Abbott Laboratories* (1990), 193 Ill. App. 3d 188, 201-02, 549 N.E.2d 1295.) Before giving an instruction, the court must first determine whether the party would have produced the evidence under the facts and circumstances of the case unless it was unfavorable. (*Thompson*, 193 Ill. App. 3d at 202.) The instruction is only warranted when a foundation is presented that: (1) the evidence was under the control of the party and could have been produced with the exercise of due diligence; (2) the evidence was not equally available to the adverse party; (3) a reasonably prudent person would have produced the evidence if he believed it would have been favorable to him; and (4) there was no reasonable excuse for failure to produce the evidence. *Tuttle v. Fruehauf Division of Fruehauf Corp.* (1984), 122 Ill. App. 3d 835, 843, 462 N.E.2d 645.

Dr. Sholl stated that he believed the record of decedent's vital signs was not available because the sheet on which they were first recorded was not a permanent document, and the decedent left the hospital the following morning before the secretary had an opportunity to transfer this information into her permanent record. Therefore, there was evidence of a reasonable excuse for the missing document, and the fourth element of a foundation for the giving of IPI Civil 2d No. 5.01 was not met. Although plaintiff argues that the determination of whether defendant's excuse for not producing the evidence was reasonable should have been left to the jury, she cites no authority to support this argument. Rather, the authority cited supports the opposite proposition that the granting or denying of jury instructions is within the province of the trial judge. We, thus, conclude that the trial judge's refusal of plaintiff's tendered jury instruction was within his discretion and was not improper.

Plaintiff claims that she was deprived of a fair trial because black jurors were excluded by defendants through the use of their peremptory challenges in *voir dire*. Plaintiff argues that defendants attempted to prohibit black jurors from being impaneled by using their peremptory challenges to exclude three black jurors. Defendants deny that they used their peremptory challenges based on race. They also argue that they challenged five Caucasians, one Hispanic and two blacks. One of the members initially selected was a black woman and the alternate was a black man. The black female juror was subsequently removed from the jury when she informed the trial judge that she was an acquaintance of the decedent's sister.

The United States Supreme Court has held that prosecutors in criminal cases could not strike potential jurors based solely upon

the fact that they are members of defendant's race or ethnic group. (*Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712.) Although this jurisdiction has not decided the issue of whether the *Batson* holding should be extended to civil actions, the United States Court of Appeals for the Seventh Circuit has held that it is applicable. (*Dunham v. Frank's Nursery & Crafts, Inc.* (7th Cir. 1990), 919 F.2d 1281.) Other jurisdictions have held both ways. However, in this case, we need not reach this issue because, even if the *Batson* ruling was applicable, plaintiff waived this issue by failing to object to defendants' exercise of their peremptory challenges until the trial was concluded and an adverse verdict was returned. See *People v. Evans* (1988), 125 Ill. 2d 50, 61-62, 530 N.E.2d 1360.

Plaintiff also argued that it was error for the trial court to remove the only black female juror based on her acquaintance with the decedent's sister. However, plaintiff has waived this question as well by failing to make a timely objection.

It is also plaintiff's contention that the jury verdict was against the manifest weight of the evidence. She argues that the expert witnesses she presented criticized the defendant doctors for failing to obtain the appropriate consultations, not involving the attending physician, not transferring the decedent to another service, not monitoring her condition and not correctly diagnosing her illness as a dissecting aortic aneurysm. Plaintiff also argues that although defendants' expert, Dr. Michaelis, testified that there was no evidence of the decedent's illness while she was at the Hospital, the lack of evidence was due to the physicians' failure to monitor her blood count and vital signs and perform an aortogram.

A jury verdict will only be set aside where it is palpably erroneous, unwarranted, arbitrary or unreasonable and not based on the evidence. (*Bautista v. Verson Allsteel Press Co.* (1987), 152 Ill. App. 3d 524, 529, 504 N.E.2d 772.) To present a case of negligent medical treatment, the plaintiff must prove: (1) the proper standard of care against which the physician's conduct is measured; (2) a negligent failure to comply with the standard; and (3) that the injury at issue was proximately caused by this negligent conduct. *Ingle v. Hospital Sisters Health System* (1986), 141 Ill. App. 3d 1057, 1064, 491 N.E.2d 139.

In this case, defendants' expert, Dr. Michaelis, testified that the defendant physicians had not deviated from the standard of care and that the decedent's death was caused by a congenital disease known as cystic medial necrosis. He also stated that the decedent's decision to leave the Hospital also contributed to the worsening of her

condition and her death. In addition, the defendants testified regarding the tests they performed, their examinations and observations and why they did not believe the presence of a dissecting aneurysm was likely. Where a physician uses his best judgment, which is equal to that ordinarily used by well-qualified doctors in similar cases, he is not liable for negligence even if that judgment later turns out to be erroneous. (*Spike v. Sellett* (1981), 102 Ill. App. 3d 270, 273, 430 N.E.2d 597.) Although the testimony of plaintiff's experts contradicted that of defendants as well as defendants' expert, we cannot conclude that the verdict was erroneous, arbitrary or unreasonable.

■ Plaintiff further contends that the trial court erred in allowing Dr. Michaelis to testify regarding cystic medial necrosis because it was a subject outside of his expertise. Dr. Michaelis testified that he was the chief of cardiothoracic surgery at Northwestern University Medical School. When shown a demonstrative exhibit, he stated that it was an excellent representation of the disease process known as cystic medial necrosis. He then proceeded to describe the disease in detail. Considering Dr. Michaelis' qualifications and his testimony, there is no support for plaintiff's allegation that the disease was beyond his expertise. Furthermore, plaintiff has waived any alleged error by failing to make a timely objection.

■ Finally, plaintiff contends that it was reversible error for the trial court to allow defense counsel to argue in his opening statement and closing argument that the decedent died from a disease known as cystic medial necrosis which she probably had since birth. Plaintiff also claims that it was error to allow defense counsel to argue that the decedent had a shortened life expectancy and that the cystic medial necrosis caused her death. It is not improper for an attorney to comment in opening statement on evidence to be introduced at the trial, if he has a reasonable belief that the evidence will be admissible. (*Yedor v. Centre Properties, Inc.* (1988), 173 Ill. App. 3d 132, 143, 527 N.E.2d 414.) In closing argument, counsel has wide latitude to argue the evidence and all reasonable inferences which may be drawn from it. *Webb*, 155 Ill. App. 3d at 853.

■ In this case, the autopsy report indicated that the decedent had cystic medial necrosis. Dr. Michaelis testified that the disease was a congenital illness which could shorten life expectancy. Therefore, these statements in counsel's argument were supported by the evidence. Also, counsel's statement that cystic medial necrosis caused the decedent's death was a reasonable inference which could be drawn from the evidence. Furthermore, any alleged error in counsel's argument was waived by plaintiff's failure to object.

Accordingly, the judgment of the circuit court is affirmed.

Judgment affirmed.

LaPORTA, J., concurs.

JUSTICE McNAMARA, dissenting:
I believe that plaintiff should be granted a new trial because of certain improper and inflammatory remarks made by defense counsel during closing argument. Both the trial judge and the majority acknowledge that the comments were improper, but found that they were not sufficiently prejudicial to warrant a new trial. I believe otherwise.

The comments in question were directed to the testimony of Dr. Portman, one of four expert witnesses who testified in favor of plaintiff.

Plaintiff called one witness as an expert in cardiovascular and thoracic surgery; another was called as an expert in internal medicine; and a third was called as an expert in obstetrics and gynecology. Dr. Portman was called as an expert in gynecology. All four witnesses testified that, based upon a reasonable degree of medical and surgical certainty, the care provided by defendants deviated from the standard of care, thus leading to the death of plaintiff's daughter.

Prior to trial, the trial court granted plaintiff's motion *in limine* prohibiting defendants from asking Dr. Portman about any abortions he may have performed during his years of practice. When granting this motion, over defendants' rigorous objection, the trial court stated that any references to abortion would be inflammatory.

When Dr. Portman was called as a witness, at defendants' request the trial judge modified his earlier *in limine* ruling. The court permitted defense counsel to ask Dr. Portman one question relating to the nature of his work at each facility where he had practiced. The court admonished defense counsel not to mention abortion, and defense counsel complied with that direction. However, when asked about the nature of his practice, Dr. Portman replied that "it was office gynecology, family planning, reproductive control, first trimester abortion procedure."

I turn now to the following improper comments made by defense counsel during closing argument:

> "And let me just tell you about the people who came in here to make criticisms. Dr. Portman who had never seen a dissection of an aneurism in his practice, who had never treated a patient

with a dissection of the aorta, who of the last six years of the last fifteen or ten had spent the greater majority of his time in those years doing first trimester abortions, doing those things that interrupt pregnancy during the first five months."

At that point, the trial court denied plaintiff's request for a side-bar and instructed defense counsel to proceed with his argument. The court allowed plaintiff's counsel to object to the remarks but surprisingly overruled the objection. The ruling was surprising because there had been no testimony that Dr. Portman had spent the greater majority of his time doing first-trimester abortions. After the court's ruling, defense counsel proceeded as follows:

"Dr. Portman said that he was in Macon, Georgia; and he had a clinic doing that type of work; and that he was in Wisconsin. And he had a clinic, and he was doing that type of work. And that he came to Chicago and he opened up a clinic for one month and closed it. That's the gentleman who is going to make a criticism of the vascular surgeon and what the vascular surgeon saw and did."

Since Dr. Portman volunteered the information that he had performed abortions, defense counsel did nothing improper in the presentation of evidence. However, his comments during closing argument were not only untrue, but were inflammatory and highly prejudicial to plaintiff's case. Abortion is an incendiary issue. Defense counsel's remarks in this case demonstrate his recognition that abortion has divided this country between those who believe that any abortion amounts to murder versus those who believe in a woman's right to have an abortion at any time. As a subject matter, abortion has no probative value in the medical malpractice case before us. The remarks constituted a veiled attack on Dr. Portman's character, and no one can assess the impact they may have had on the jury. (See *Poole v. University of Chicago* (1989), 186 Ill. App. 3d 554, 542 N.E.2d 746.) Such comments should not be countenanced.

Nor can the remarks be found to be harmless error on the ground that Dr. Portman's testimony was merely cumulative since plaintiff presented three other expert witnesses. Each of the witnesses had a field of medical expertise, and the remarks directed about Dr. Portman may have been fatal to plaintiff's case.

At oral argument before this court, defense counsel stated that it was not the defense which acted improperly, but rather it was plaintiff's counsel who acted unwisely in offering as an expert witness a doctor who had performed abortions. No statement could demonstrate

more vividly the prejudice plaintiff suffered as a result of the comments in question.

I do not find that any of the other assignments of error complained of by plaintiff warrant a new trial. I would, however, reverse the judgment of the trial court and remand for a new trial on the basis of the prejudicial closing argument.