DENISE SHIRK, a/k/a Denise Draggist, Plaintiff-Appellee, v. JUDITH A. KELSEY, Defendant-Appellant.

First District (6th Division)   No. 1—91—0738

Opinion filed May 7, 1993.

William V. Johnson, of Johnson & Bell, Ltd., of Chicago (Thomas H. Fegan, of counsel), for appellant.

Eric H. Check and J. Reed Millsaps, both of Chicago, for appellee.

PRESIDING JUSTICE McNAMARA delivered the opinion of the court:

Plaintiff, Denise Shirk, formerly known as Denise Draggist, brought a medical malpractice action against defendant, Judith A. Kelsey, M.D., to recover damages for injuries sustained as a result of defendant's alleged negligence and wilful and wanton misconduct in the performance of an abortion. A jury found in favor of plaintiff on the negligence count for $300,000, but reduced the award by 25% for plaintiff's comparative negligence. The jury also found in favor of plaintiff on the wilful and wanton misconduct count, and awarded punitive damages in the amount of $300,000. The jury decreased the punitive damage award by 50% based upon plaintiff's comparative negligence. As to the negligence count, the trial court entered judgment on the jury's verdict. As to the wilful and wanton misconduct, the trial court disallowed the jury's reduction and entered judgment on the full amount.

On appeal, defendant contends that the jury verdicts on the wilful and wanton count as well as the negligence count are not supported by the evidence, and that prejudicial comments and erroneous rulings made by the trial judge deprived defendant of a fair trial.

At trial, plaintiff testified that in June 1982, Doctor Edward J. Saad diagnosed that she was approximately six weeks pregnant. Plaintiff scheduled an abortion at National Health Care Services in Peoria, Illinois, to terminate the pregnancy. On July 10, 1982, plaintiff paid the receptionist for the procedure and signed a three-page consent form which a staff member reviewed with her. Blood and urine samples were drawn by laboratory technicians, and plaintiff spoke with counselling personnel. (Plaintiff previously was pregnant and had an abortion at National Health Care Services in March 1981.)

After approximately three hours, defendant entered the examining room and introduced herself to plaintiff. Defendant explained the procedure and conducted a pelvic examination. She warned plaintiff that there would be some bleeding after the procedure, and that she would also be passing blood clots. After defendant performed the abortion, plaintiff was taken into the recovery room. Plaintiff stated that she was in a lot of pain and experiencing cramps, and that she was crying. She was upset about having the abortion and knew it was a mistake.

A nurse entered the recovery room and informed her that defendant had examined the expelled tissue, and she would have to be suctioned again because all tissue had not been removed. Defendant performed a second suction procedure. After the second procedure, the nurse told plaintiff that there was no chance that she could still be pregnant. Plaintiff returned to the recovery room and received some medication. Thereafter, another staff member returned with a "scant tissue letter" which plaintiff was asked to read and sign. Plaintiff was told to expect some bleeding and cramping, and was instructed to contact the clinic if she had any problems. She was also told to return for a follow-up visit so that she could be examined to make sure that she still was not pregnant.

Upon returning home, plaintiff had some bleeding and cramping, and also passed clots for about a week after the procedure. Plaintiff did not contact anyone at the clinic at that time. During the second week, the bleeding increased and plaintiff's cramps became more severe. She spoke with a receptionist at the clinic and made an appointment to see defendant. On July 22, plaintiff returned to the clinic and described her symptoms to defendant. She described the heavy bleeding, the unusual clotting, the severity of the cramps, and that she experienced a loss of bladder control. Defendant performed a pelvic examination upon plaintiff and told her that she had a urinary tract infection and prescribed an antibiotic. Plaintiff asked defendant whether she could still be pregnant; defendant answered that she could not.

After leaving the clinic on July 22, plaintiff continued to experience the same symptoms at varying frequencies. Plaintiff stated that she called defendant to report these symptoms, but was unable to give any dates or the number of times that she called. She spoke only with the receptionist, and she was always reassured that there was no problem. She received no other calls from the clinic. Plaintiff's mother also called the clinic on her behalf.

Around September, plaintiff noticed a knot in her stomach, and that she was gaining weight. Plaintiff and her mother both thought that she might still be pregnant because of her appearance. On September 27, plaintiff began experiencing severe stomach cramps and passed a lot of blood with clotting. Plaintiff's mother thought she might be having a baby, so she instructed plaintiff's brother to take her to St. Francis Hospital in Peoria. Plaintiff received a pelvic examination upon arriving at the hospital and was told that there was a foot protruding into her vaginal area, and that she was going to have a baby. After two to three hours of labor, plaintiff delivered a baby

boy who lived for approximately 90 minutes. She remained in the hospital for a few days and was discharged with some restrictions as to work and leisure activities.

Plaintiff stated that as a result of this incident, she has experienced emotional problems. As explained by plaintiff:

"I've had a lot of nightmares. I wake up nights reliving the baby's birth, the baby's death. I relive having the abortion. I go through a terrible morning [sic] period a month before the baby's death. I'm detached from my husband and my kids for at least a month before and weeks afterward. It puts a lot of strain on my marriage because I'm not really fit to be around."

According to plaintiff, she still mourns her son's death every year. What happened to her was her "worst nightmare" and she felt as though she was "being repaid" for the two abortions that she had undergone.

On cross-examination, plaintiff stated that she understood the paragraph contained in the consent form which explained the possibility that not all of the fetal tissue may be removed, resulting in an incomplete abortion. Plaintiff also indicated that she understood the importance of follow-up care after the abortion was performed. She received the letter from a staff member explaining that the tissue removed from her uterus would be sent to a pathology laboratory where a microscopic examination would be conducted.

Plaintiff did not recall receiving a telephone call from the director of the clinic, Margaret VanDuyn, informing her that the pathology report revealed information important to her care, and that she should return to the clinic for an appointment. In spite of the fact that plaintiff experienced bleeding throughout the summer, she did not contact Doctor Saad, her obstetrician/gynecologist. After the July 22 visit and pelvic examination by defendant, she was instructed to return to the clinic if she experienced any further problems.

Doctor Saad testified for plaintiff that he was the attending physician when plaintiff was admitted to the hospital in September 1982. The resident on duty at the time diagnosed that plaintiff had an intrauterine pregnancy, approximately 24 weeks by history, or 17 to 18 weeks by size. Doctor Saad opined that the fetus did not have a reasonable chance of survival. A dilation and curretage procedure was performed upon plaintiff immediately following delivery.

Doctor Saad stated that he was a practicing obstetrician and gynecologist in the Peoria area, and that ultrasound, an instrument used to measure the size and shape of various internal organs, was available as a diagnostic tool in that area prior to July 10, 1982. He

considered ultrasound and sonogram as very reliable methods for diagnosing pregnancy in 1982.

Plaintiff's brother, Richard Draggist, testified that plaintiff did not want to go through with the abortion, and that she was particularly distressed after delivery. Similarly, Raymond Eiff, a family friend, testified that plaintiff was very depressed as a result of this incident. Marilyn Draggist, plaintiff's mother, testified that plaintiff was "guilty, ashamed and depressed" following the July 10, 1982, abortion. The mother telephoned the clinic a number of times during the period between July 10 and July 22, 1982, because she was concerned about the pain and bleeding plaintiff had experienced. She also spoke with the clinic several times after the July 22 appointment.

Margaret VanDuyn testified by way of evidence deposition. She had been employed by National Health Care Service for 16 years. She was the administrator and clinic director. On average, approximately 28 first-trimester abortions were performed each day at the clinic.

VanDuyn and defendant analyzed the tissue removed after the first suction procedure was performed upon plaintiff. They noted that very little tissue had been removed from the uterus. Defendant allowed plaintiff to rest a few moments in the recovery room before undertaking a second suction procedure. After the second procedure, VanDuyn observed that virtually no tissue was removed. VanDuyn and defendant gave plaintiff a scant tissue letter, which is given to patients when a false pregnancy, an ectopic pregnancy, or an incomplete abortion is suspected. VanDuyn reviewed this letter with plaintiff following the second suction procedure.

The tissue removed from plaintiff was shipped to a pathologist for review. When VanDuyn received the report, she contacted plaintiff and asked her to come into the clinic. A few days later, plaintiff called complaining of cramping, bleeding and passing clots. The pathology report was received prior to plaintiff's July 22 appointment, and defendant had an opportunity to review its contents. VanDuyn and defendant reviewed the report together and discussed various possibilities including administering another pregnancy test. However, they rejected that idea because plaintiff's hormone level shortly after the pregnancy would probably cause a positive result. Defendant's record indicated that she felt no adnexal masses, and that plaintiff's pelvis felt normal thereby ruling out the possibility of an ectopic pregnancy. They decided to recheck plaintiff's condition when she returned to the clinic in one week. VanDuyn also testified that ultrasound was available in the Peoria area in 1982.

Following the July 22 appointment, VanDuyn contacted plaintiff and again went over the scant tissue report. She asked plaintiff to return to the clinic in one week after the July 22 appointment for another evaluation. Plaintiff never returned after July 22 although VanDuyn made at least two attempts to contact her at the number listed on the scant tissue report. She did not know whether defendant made any attempt to contact plaintiff after plaintiff did not return for her checkup after the July 22 appointment. The policy at that time was to inform the physician, who was responsible for directing other staff personnel.

The next contact VanDuyn had with plaintiff occurred in September, when she received a telephone call informing her that plaintiff had delivered a stillborn child. VanDuyn discussed the situation with defendant. Defendant stated that plaintiff "asked to terminate the pregnancy and we terminated the pregnancy." VanDuyn described defendant's reaction as "professional, cold, aloof."

Doctor Elliot Levine testified as an expert witness on plaintiff's behalf. He was familiar with the standard of care for terminating first-trimester pregnancies. He estimated that plaintiff was approximately nine weeks pregnant at the time the abortion was performed. According to Doctor Levine, defendant did not deviate from the standard of care with respect to the attempted abortion. He highlighted the significance of a pathology report to determine whether in fact a pregnancy was aborted. Other procedures used to ascertain whether a pregnancy had been terminated included repeating a pregnancy test or performing an ultrasound of the pelvis and uterus to determine its contents.

Doctor Levine opined that ultrasound was "quite good in diagnosing close to a hundred percent" of continuing pregnancies beyond nine weeks. He surmised from his review of the records that ultrasound was available in the Peoria area in 1982. It was a recognized and accepted method to determine the continuation of a pregnancy after an attempted abortion of a nine-week pregnancy where scant tissue is found because it enabled a physician to rule out an ectopic pregnancy, which can be a life-threatening possibility. Doctor Levine opined appropriate care that should have been rendered by defendant after having performed two abortions, and having noted scant tissue after both suction procedures, would have been to pursue a further investigation to explain the pathology report. One of the best tools available would be to perform an ultrasound, or repeat a pregnancy test.

After reviewing defendant's medical records following plaintiff's July 22 examination, Doctor Levine found no complaints by plaintiff or a notation of any diagnosis recorded in the charts. He opined that plaintiff's uterus could not have been of normal size, for it had to have grown as the pregnancy progressed. Doctor Levine stated that defendant deviated from the standard of care with respect to the subsequent management and follow-up care of plaintiff, and that substandard care was provided after the procedure. He felt that it was not unreasonable for plaintiff not to have returned to defendant or any other doctor after she was told not to worry about her bleeding and cramping complaints, and she was told that she was not pregnant.

Doctor Levine further testified that plaintiff suffered no permanent injury as a result of defendant's deviation from the standard of care. However, in view of his extensive clinical experience with women who have sustained either spontaneous miscarriages or elective, induced abortions, he felt that the impact of this event could lead to emotional problems such as those described by plaintiff.

On cross-examination, Doctor Levine indicated that he believed someone who was manifesting symptoms such as defendant was experiencing should have returned for medical care. Following a first-trimester abortion, the urine test could register an incorrect positive result for one week.

Defendant testified as an adverse witness during plaintiff's case in chief. Her license to practice medicine in Illinois had just been suspended because of her failure to pay a renewal fee. Defendant stated that although she was practicing as an obstetrician/gynecologist in 1982, she had no residency training in that specialty.

Defendant described the two suction procedures she performed on plaintiff, which essentially paralleled VanDuyn's and plaintiff's account of the events. The pathology report was sent out in accordance with routine procedure, and defendant made a mental note that if plaintiff did not return for her three week checkup, she would remind the administrator to contact her. Defendant was quite certain even prior to the results of the pathology report that the pregnancy had not been terminated, and that it was either intrauterine or an ectopic pregnancy; however, she made no such notation in plaintiff's chart.

Defendant received plaintiff's pathology report prior to the July 22 appointment. After reading the report, defendant concluded that the pregnancy had not been terminated on July 10 because the report indicated that no products of conception were found. Defendant suspected three possibilities for plaintiff's condition, which included an

ectopic pregnancy, an incomplete abortion which spontaneously passed between July 10 and July 22, or that she had an incomplete abortion which did not pass between that time period.

When defendant saw plaintiff on July 22, she was entertaining any one of 150 diagnoses prior to the time that she began her examination. Plaintiff made no "meaningful" complaints to her prior to the examination, and the symptoms she described conflicted with those given to other staff members. However, defendant conceded that complaints would be meaningful from a woman upon whom she had performed two suction abortion procedures to terminate a nine-week pregnancy 12 days earlier, where scant tissue was recovered, who was then complaining of bleeding, passing clots, pain, and where the pathologist's report indicated that no products of conception were found.

At the July 22 examination, defendant found plaintiff's uterus to be within an acceptable range for a woman who had undergone an abortion 12 days ago. She concluded that plaintiff was not pregnant either within the uterus or ectopically. She specifically told plaintiff to return to the clinic in one week. She treated her by prescribing ampicillin, but was not certain that plaintiff had a urinary tract infection. In defendant's opinion, the only appropriate treatment was to have plaintiff return in one week when conclusive findings could be evaluated. When plaintiff did not return for a checkup, defendant made an attempt to get her phone number from VanDuyn, but her request was denied. Defendant told VanDuyn that it was critical for plaintiff to return to the clinic within the next few days, and VanDuyn stated that she would try to reach her. Defendant stated that the only access to the medical records was through VanDuyn, and that VanDuyn refused to give defendant the chart because she felt it would invade the patient's privacy, and that VanDuyn would call her.

Defendant testified that ultrasound was available in the Peoria area in 1982, in contravention to her deposition testimony where she indicated that it was not available at all in that community. Defendant agreed that given the possibility plaintiff might still be pregnant with a potentially fatal ectopic pregnancy, ultrasound might have been a good suggestion. In the hands of qualified personnel, ultrasound was very reliable in diagnosing a pregnancy beyond nine weeks. On October 18, 1982, defendant learned of the birth of plaintiff's baby. She did not act indifferent or cold.

Doctor Robert Bouer testified on behalf of defendant. He testified that the pelvic examination was in error; however, it was not unusual for doctors to disagree about findings of the uterus during a pelvic ex-

amination because of the difficulties in the examination. He felt that defendant rendered appropriate medical care to the patient, given her findings and impressions. A physician with a large volume practice would not be expected to follow up and look for patients personally. Further, a patient who has undergone these procedures and has been warned has a duty to seek medical help, either with the original gynecologist or some other physician. Doctor Bouer believed that an ultrasound examination was not indicated because defendant did not feel an enlarged uterus.

Doctor Bouer further opined that a patient's complaints of passing clots and bleeding and pain would be important complaints in light of plaintiff's recent medical history. Any follow-up care in contacting a patient could be performed by staff personnel at the doctor's direction. Doctor Bouer found it incredible that a nonphysician such as VanDuyn would refuse to turn over a medical chart to a well-qualified physician. He further testified that when plaintiff left defendant's care on July 22 suspecting that she might still be pregnant, she would have a duty to continue follow-up care. He did not believe that it was negligent for a physician to decline to order ultrasound if an ectopic pregnancy had already been ruled out.

The jury found in favor of plaintiff on both the negligence and wilful and wanton misconduct counts. As previously discussed, the jury reduced the wilful and wanton misconduct count by 50% for plaintiff's comparative negligence. Relying upon the reasoning employed by this court in *Burke v. 12 Rothschild's Liquor Mart, Inc.* (1991), 209 Ill. App. 3d 192, 568 N.E.2d 80, the trial court disallowed the reduction on the wilful and wanton misconduct count for plaintiff's comparative negligence.

At the outset, we observe that the dispositive issue on review concerns whether defendant breached the standard of care with regard to the manner in which follow-up care was provided after plaintiff's abortion. We note that several ancillary issues in this appeal, including the propriety of allowing plaintiff to amend the complaint on the eve of trial to add a wilful and wanton misconduct count, permitting the submission of the wilful and wanton allegations to the jury, refusal to render the appropriate Illinois Pattern Jury Instructions defining wilful and wanton conduct, and the inconsistent verdicts of the jury regarding plaintiff's comparative negligence, are derived from the award of punitive damages for defendant's alleged wilful and wanton misconduct. Accordingly, in light of the significance of this issue to the disposition of this case, we shall first focus our attention upon

whether the evidence presented at trial supported an award of punitive damages for defendant's conduct.

It is instructive to first examine the basic tenets for defining wilful and wanton conduct in the context of the award of punitive damages. In general, punitive damages may be awarded when the defendant has acted wilfully or with wanton disregard for the rights of others. Such damages are allowed as a warning and example to deter the defendant and others from committing like offenses in the future. (*Burke v. 12 Rothschild's Liquor Mart*, 209 Ill. App. 3d 192, 568 N.E.2d 80; *Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, 384 N.E.2d 353.) Wilful and wanton conduct is found where an act was done " 'with actual intention or with a conscious disregard or indifference for the consequences when the known safety of other persons was involved.' " (*Lynch v. Board of Education of Collinsville Community Unit District No. 10* (1980), 82 Ill. 2d 415, 430, 412 N.E.2d 447, quoting *Myers v. Krajefska* (1956), 8 Ill. 2d 322, 329.) A determination of wilful and wanton misconduct will be based on the facts of any given case. *Burke v. 12 Rothschild's Liquor Mart*, 209 Ill. App. 3d 192, 568 N.E.2d 80; *Spring v. Toledo, Peoria & Western R.R. Co.* (1977), 69 Ill. 2d 290, 371 N.E.2d 621.

Because of their penal nature, punitive damages are not favored in the law. (*Deal v. Byford* (1989), 127 Ill. 2d 192, 203, 537 N.E.2d 267; *Kelsay v. Motorola, Inc.*, 74 Ill. 2d 172, 384 N.E.2d 353; *Cornell v. Langland* (1982), 109 Ill. App. 3d 472, 440 N.E.2d 985.) An award of punitive damages has been deemed appropriate in situations where torts are committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts wilfully, or with such gross negligence as to indicate a wanton disregard of the rights of others. (*Kelsay v. Motorola, Inc.*, 74 Ill. 2d 172, 384 N.E.2d 353.) As set forth in the Restatement (Second) of Torts §908(2) (1979):

> "Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others. In assessing punitive damages, the trier of fact can properly consider the character of the defendant's act, the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause ***." Restatement (Second) of Torts §908(2) (1979).

In *Stogsdill v. Manor Convalescent Home, Inc.* (1976), 35 Ill. App. 3d 634, 343 N.E.2d 589, this court set aside an award for punitive damages where a convalescent patient brought an action against a physician when her leg was amputated as a result of allegedly deficient medical and convalescent care. The evidence at trial demon-

strated that the plaintiff was at high risk for ulcer healing problems due to her advanced age. The plaintiff developed an ulcer on her ankle, and gangrene set in within five months. During that interim period, the defendant saw her repeatedly. In spite of continuing reports from the nursing home staff and the patient's family, the defendant failed to institute appropriate and necessary care and to diagnose the gangrene. Expert testimony established that those failures constituted a deviation from the standard of care. Nonetheless, the *Stogsdill* court set aside the $80,000 judgment for punitive damages, despite its conclusion that the defendant "left undone many things which he ought to have done." 35 Ill. App. 3d at 660.

Plaintiff relies upon *Ingram v. Little Co. of Mary Hospital* (1982), 108 Ill. App. 3d 456, 438 N.E.2d 1194, as support for her position that a health-care provider can be liable for wilful and wanton misconduct, if it acts with reckless disregard for the safety of others. We find, however, that *Ingram* is distinguishable from the present case, since there the court only considered whether the plaintiff's allegations stated an action for the hospital's wilful and wanton misconduct sufficient to withstand a motion to dismiss.

■ The initial decision as to whether punitive damages may be imposed in a particular case in this State is a matter normally reserved to the trial judge. (*Loitz v. Remington Arms Co.* (1990), 138 Ill. 2d 404, 563 N.E.2d 397; *J.I. Case Co. v. McCartin-McAuliffe Plumbing & Heating, Inc.* (1987), 118 Ill. 2d 447, 516 N.E.2d 260; *Hammond v. North American Asbestos Corp.* (1983), 97 Ill. 2d 195, 454 N.E.2d 210.) In the present case, we do not believe that sufficient evidence of defendant's wilful and wanton misconduct existed to justify submitting plaintiff's claim for punitive damages to the jury. We hold that defendant's follow-up care did not constitute such a gross deviation from the standard of care so as to be characterized as wilful and wanton misconduct.

The distinction between wilful and wanton misconduct and negligence in any given case necessitates close scrutiny according to the particular facts presented. Such scrutiny of the record reveals that the follow-up care rendered by defendant does not rise to the level of wilful and wanton conduct. Prior to the time that defendant met with plaintiff on July 22, she had an opportunity to review the pathology report and consider a number of possible diagnoses. She performed a pelvic examination, and told plaintiff to return in a week so that her condition could again be evaluated. Plaintiff did not dispute receiving that instruction. The administration of a pregnancy test would have been of no benefit because plaintiff's hormone level shortly after the

pregnancy would have likely caused a positive result for approximately one week, as testified to by plaintiff's expert, Doctor Levine. While it is true that defendant could have utilized ultrasound as a diagnostic tool to determine whether plaintiff was still pregnant on July 22, we do not believe the failure to do so, in itself, is sufficient to warrant the imposition of punitive damages. As previously discussed in *Stogsdill*, negligent actions or omissions do not support an award of punitive damages.

The testimony of the clinic director, Margaret VanDuyn, stated that defendant reacted to the birth of plaintiff's baby in a cold, professional, aloof manner. Even so, we do not believe that such conduct evinces a reckless indifference or conscious disregard of consequences, or a state of mind characteristic of wilful and wanton conduct. The conduct must involve some element of outrage similar to that usually found in crime, either because the defendant's acts are done with an evil motive or because they are done with reckless indifference to the rights of others. *Loitz v. Remington Arms*, 138 Ill. 2d 404, 563 N.E.2d 397; Restatement (Second) of Torts §908, Comment *b*, at 464-65 (1979).

(Parenthetically, we note that section 2—1115 of the Illinois Code of Civil Procedure, effective August 15, 1985, provides that punitive damages are no longer recoverable in healing art malpractice cases. (Ill. Rev. Stat. 1987, ch. 110, par. 2—115).)

In view of our conclusion that insufficient evidence of wilful and wanton misconduct existed to support the jury's determination, we reverse that portion of the judgment awarding punitive damages to plaintiff. Thus, we must now decide whether defendant's conduct was negligent.

■ Defendant contends that the verdict of the jury on the negligence count is not supported by the evidence; thus, that she is entitled to judgment notwithstanding the verdict or to a new trial on this basis. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504.) The distinctions between reckless conduct and negligence are elucidated in Comment *g* of the Restatement (Second) of Torts §500:

"[Reckless misconduct] differs from that form of negligence which consists in mere inadvertence, incompetence, unskillfulness, or a failure to take precautions to enable the actor adequately to cope with a possible or probable future emergency, in that reckless misconduct requires a conscious choice of a course of action, either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose

this danger to any reasonable man. It differs not only from the above mentioned form of negligence, but also from that negligence which consists in intentionally doing an act with knowledge that it contains a risk of harm to others, in that the actor to be reckless must recognize that his conduct involves a risk substantially greater in amount than that which is necessary to make his conduct negligent. The difference between reckless misconduct and conduct involving only such a quantum of risk as is necessary to make it negligent is a difference in the degree of the risk, but this difference of degree is so marked as to amount substantially to a difference in kind." Restatement (Second) of Torts §500, Comment *g*, at 590 (1965).

To present a case of negligent medical treatment, the plaintiff must prove: (1) the proper standard of care against which the physician's conduct is measured; (2) a negligent failure to comply with the standard; and (3) that the injury at issue was proximately caused by this negligence. *Brown v. Moawad* (1991), 211 Ill. App. 3d 516, 570 N.E.2d 490.

■ In this case, plaintiff sustained her burden of demonstrating defendant's negligence in the follow-up care provided to her. Doctor Saad testified that ultrasound was available in the Peoria area in 1982, and that it was a reliable method for diagnosing pregnancy. Doctor Levine testified that ultrasound was a recognized and accepted method to determine the continuation of a pregnancy after an attempted abortion of a nine-week pregnancy where scant tissue is found. Doctor Levine believed that under the circumstances, defendant should have pursued a further investigation to explain the pathology report, either through the performance of an ultrasound, or a repeat pregnancy test. It was his opinion that defendant deviated from the standard of care with respect to the subsequent management and follow-up care of plaintiff. Indeed, defendant also agreed that given the possibility plaintiff might still be pregnant with an ectopic pregnancy, ultrasound was a good suggestion and a very reliable method in diagnosing a pregnancy beyond nine weeks.

We also consider defendant's testimony that although she was quite certain even prior to the results of the pathology report that the pregnancy had not been terminated, she made no such notation in plaintiff's chart. Defendant's own expert, Doctor Bouer, testified that when plaintiff left defendant's care on July 22 suspecting that she might still be pregnant, she would have a duty of continued follow-up care. In Illinois, a surgeon is required to continue caring for the pa-

tient until the threat of post-operative complications is past. *Longman v. Jasiek* (1980), 91 Ill. App. 3d 83, 414 N.E.2d 520.

Without doubt, plaintiff's failure to seek medical help or return for a follow-up visit in one week following the July 22 examination further complicated her condition. According to defendant, the only access she had to defendant's medical records was through VanDuyn, who refused to give the chart to her because it would invade plaintiff's privacy. However, even defendant's own expert witness found it incredible that a nonphysician such as VanDuyn would refuse to turn over a medical chart to a physician. (We also note that plaintiff's judgment was reduced by 25% for her comparative negligence.)

Accordingly, we find that the jury's finding of negligence on the part of defendant has ample support in the record.

■ Finally, defendant asserts that the combination of several errors and improper rulings made by the trial judge demonstrate his prejudice against the abortion procedure and the fact that defendant performed it, which in turn effectively deprived her of a fair trial. Defendant contends that comments made by the judge during the conference on jury instructions stating that if defendant was found guilty she should be punished with a capital "P" demonstrate his prejudice. These comments, however, were made outside the presence of the jury; as such, they could not have deprived defendant of a fair trial.

Additionally, review of the record reveals that prior to trial, the judge advised both sides that he was a practicing Roman Catholic. Despite his religious convictions, the judge believed that he would be able to preside over the trial in a fair and impartial manner. Both sides were afforded the opportunity to discuss his assignment to their case with their clients and to ask for his recusal. Defendant's attorney discussed the assignment with the partners at her law firm and informed the judge that she had no objection to the judge presiding over the trial.

■ Defendant further contends that the prejudice of the trial judge was exacerbated by the improper conduct of plaintiff's counsel throughout this case. Specifically, defendant maintains that plaintiff offered improper evidence and arguments regarding the nature of the procedure and plaintiff's regret at having the abortion, defendant's contemplation of not performing the abortion, and plaintiff's right to recover damages for her emotional pain resulting from the abortion.

Prior to trial plaintiff filed an amended complaint, in which a cause of action for negligent infliction of emotional distress was added. To be entitled to recovery for the negligent infliction of emotional distress, a plaintiff must prove three elements: (1) the plaintiff

must have been in the zone of danger; (2) the plaintiff must have felt contemporaneous fear for his safety; and (3) the plaintiff must show some sign of physical injury or illness as a result of his emotional distress. (*Robbins v. Kass* (1987), 163 Ill. App. 3d 927, 516 N.E.2d 1023.) The physical illness or injury requirement indicates a desire to permit compensation only in cases involving severe or serious emotional distress. (*Robbins v. Kass*, 163 Ill. App. 3d 927, 516 N.E.2d 1023.) In view of the fact that plaintiff was advancing a claim for negligent infliction of emotional distress, we find that plaintiff's testimony concerning her feelings both prior and subsequent to the abortion were relevant to prove the elements of this cause of action.

■ Defendant also contends that the trial judge improperly changed defendant's testimony as to whether she had seriously considered not performing the abortion. The judge misstated defendant's response after plaintiff's counsel asked defendant in various ways whether she considered not performing this abortion.

The conduct and remarks of the judge are grounds for reversal only if they are such as would ordinarily create prejudice in the minds of the jury. (*Oko v. Rogers* (1984), 125 Ill. App. 3d 720, 466 N.E.2d 658.) An error is not reversible unless it has been shown that the error was substantially prejudicial and thereby unduly affected the outcome of the trial. (*Skelton v. Chicago Transit Authority* (1991), 214 Ill. App. 3d 554, 573 N.E.2d 1315.) In the present case, where the issue on appeal concerned defendant's rendition of follow-up care and did not attack whether the abortion was wrongfully performed, we do not find that the judge's error was unduly prejudicial to defendant.

For the foregoing reasons, the judgment of the circuit court of Cook County as to the negligence count is affirmed and as to the wilful and wanton conduct is reversed.

Affirmed in part; reversed in part.

RAKOWSKI and GIANNIS, JJ., concur.