VERA TOWNSEND, as Special Adm'r of the Estate of Debra Puckett, Deceased, Plaintiff-Appellee and Cross-Appellant, v. UNIVERSITY OF CHICAGO HOSPITALS *et al.*, Defendants-Appellants and Cross-Appellees.

First District (3rd Division)    Nos. 1—00—1301, 1—00—1369 cons.

Opinion filed December 20, 2000.—Rehearing denied January 24, 2001.

HALL, P.J., dissenting.

Cassiday, Schade & Gloor, of Chicago (Bradford D. Roth, Catherine L. Garvey, and Morgan M. Strand, of counsel), for appellants.

· Sal Indomenico & Associates, P.C., of Chicago (Sal Indomenico and Janet Fasano, of counsel), for appellee.

JUSTICE WOLFSON delivered the opinion of the court:

The question in this medical negligence case is whether the proof created a fatal gap between the defendant doctor's purported negligent breach of the applicable standard of care and the death of Debra Puckett. The trial judge held there was enough evidence of proximate cause to take the case to the jury, which found in favor of the plaintiff. We do not agree. We find the defendants are entitled to judgment notwithstanding the verdict.

FACTS

Debra Puckett (Puckett), a 37 year-old single mother, suffered from transverse myelitis, a neurological impairment she contracted in 1992 after an adverse reaction to a hepatitis vaccination. Puckett had decreased motor strength and sensation below her waist, and she was confined to a wheelchair. Puckett also had an indwelling catheter to drain her urine.

Around 7:30 p.m. on February 20, 1994, Puckett went to the University of Chicago Hospital emergency room, complaining of a high fever, diffuse back pain, and foul-smelling, cloudy urine. Dr. Diane Chaney (Chaney), the emergency room attending physician that night, examined Puckett and provisionally concluded she had a urinary tract or kidney infection. Dr. Chaney ordered antibiotics, intravenous fluids, blood tests, and a urine culture for Puckett.

Around 1 a.m. on February 21, Dr. Chaney decided to admit Puckett to the neurology floor of the hospital, where she could receive treatment for her infection by medical personnel familiar with the needs of neurological patients. Shortly after her transfer to the neurology floor, Puckett's blood pressure fell. A team from the intensive care unit gave Puckett a central i-v line, and her blood pressure stabilized.

Several hours later, Puckett was transferred to the intensive care unit, where she continued to receive antibiotics and fluids. Around 10 a.m., Puckett was placed on a breathing machine, and her condition deteriorated rapidly. Puckett died in the intensive care unit around 4:30 p.m. An autopsy revealed she had a kidney stone, which caused a severe infection and ultimately septic shock and death.

Vera Townsend (Townsend), special administrator of Puckett's estate, filed a two-count medical malpractice complaint against, *inter alia*, the hospital and Dr. Chaney, under the Wrongful Death Act (740 ILCS 180/0.01 *et seq.* (West 1998)) and the Survival Act (755 ILCS 5/27—6 (West 1998)). A jury heard the case.

At the close of Townsend's case in chief, the trial court directed a verdict in the defendants' favor on the survival count. The jury ultimately returned an $850,000 verdict in Townsend's favor on the wrongful death count. Following unsuccessful posttrial motions by both parties, including a motion for judgment notwithstanding the verdict made by the defendants, this appeal and cross-appeal followed.

DECISION
The defendants raise two issues on appeal. First, they contend the trial court erred in denying their motions for judgment notwithstanding the verdict because Townsend failed to present any evidence of proximate cause. Second, they contend they are entitled to a new trial because of various trial errors.

Judgment *Non Obstante Veredicto*—Proximate Cause
■ The trial court should enter judgment *non obstante veredicto*, or judgment *n.o.v.*, where "all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510, 229 N.E.2d 504 (1967); accord *Maple v. Gustafson*, 151 Ill. 2d 445, 453, 603 N.E.2d 508 (1992). Judgment *n.o.v.* will be granted only if plaintiff fails to prove an essential element of negligence, including proximate cause. *Suttle v. Lake Forest Hospital*, 315 Ill. App. 3d 96, 102, 733 N.E.2d 726 (2000); accord *Merlo v. Public Service Co.*, 381 Ill. 300, 45 N.E.2d 301 (1942); see *Borowski v. Von Solbrig*, 60 Ill. 2d 418, 424, 328 N.E.2d

301 (1975) (proximate cause is an element of negligence). A motion for judgment *n.o.v.* presents a question of law which we review *de novo. Williams v. Hall,* 288 Ill. App. 3d 917, 919, 681 N.E.2d 1037 (1997); see *Keen v. Davis,* 108 Ill. App. 2d 55, 62, 246 N.E.2d 467 (1969) ("in determining the propriety of the granting of a motion for judgment n.o.v., a reviewing court is confronted with a question of law"); but see *Johnson v. National Super Markets, Inc.,* 257 Ill. App. 3d 1011, 1015, 630 N.E.2d 934 (1994) (the reviewing court applies the same judgment *n.o.v.* standard as the trial court).

Before the trial began, Townsend's attorney informed the court the only malpractice issues concerned Puckett's care in the emergency room. Townsend's issues instruction charged the defendants negligently "failed to order or perform imaging studies in the emergency room, specifically either a flat plate x-ray, an ultrasound or a CT [scan] of the abdomen" or "failed to transfer Debra Puckett to a medical or ICU floor in light of her sepsis."

The defendants contend even if they breached the standard of care, none of the failures asserted by Townsend was a proximate cause of Puckett's death. The defendants direct our attention to *Aguilera v. Mount Sinai Hospital Medical Center,* 293 Ill. App. 3d 967, 691 N.E.2d 1 (1997).

Aguilera visited the Mount Sinai Hospital emergency room with complaints of numbness on the left side of his body. Shortly after he was admitted to the hospital, he began to suffer seizures. A CT scan revealed a massive cerebral hemorrhage. Aguilera lapsed into a coma and died three days later.

In a wrongful death medical malpractice action against the hospital, the plaintiff, Aguilera's wife, offered testimony from two expert witnesses. Both experts testified the emergency room physician should have ordered an immediate CT scan, given Aguilera's signs and symptoms.

The plaintiff's emergency medicine expert testified a prompt CT scan would have permitted the medical or surgical intervention that may have saved Aguilera's life. According to the emergency medicine expert, Aguilera had a greater-than-50% chance of survival if "appropriately diagnosed." *Aguilera,* 293 Ill. App. 3d at 969. The emergency medicine expert asserted the delayed CT scan was "definitely related" to Aguilera's death. *Aguilera,* 293 Ill. App. 3d at 969. But, assuming Aguilera received a prompt CT scan, the emergency medicine expert acknowledged he would have deferred to a neurosurgeon to decide whether surgical intervention was appropriate. The plaintiff's neurology expert testified an early CT scan would have permitted effective treatment for Aguilera, neurosurgery to stop the thalamic

bleed. According to the neurology expert, Aguilera had a 75% to 80% chance of survival with prompt treatment. But the neurology expert also acknowledged he would have consulted, if not deferred to, a neurosurgeon on the appropriateness of surgical intervention. The trial court entered judgment notwithstanding the verdict for the hospital.

On appeal, we reviewed *Holton v. Memorial Hospital*, 176 Ill. 2d 95, 679 N.E.2d 1202 (1997), and its view of the "lost chance" doctrine. *Holton* held the "lost chance" doctrine is not a separate theory of recovery in Illinois, but is a concept that enters into a proximate cause analysis where the plaintiff alleges the defendant's negligently delayed diagnosis lessened the effectiveness of its treatment. *Aguilera*, 293 Ill. App. 3d at 973, quoting *Holton*, 176 Ill. 2d at 115. We agreed with the hospital: judgment *n.o.v.* is appropriate in a wrongful death case "where the evidence reveals that no medical treatment was available for the decedent's fatal illness." *Aguilera*, 293 Ill. App. 3d at 974.

We examined the plaintiff's expert testimony and concluded:

> "Without supporting testimony from a neurosurgeon, plaintiff's experts' testimony was insufficient to show that neurosurgery, much less effective neurosurgery, should have occurred absent defendants' negligence. ***
>
> ***
>
> *** The absence of expert testimony that, under the appropriate standard of care, an analysis of an earlier CT scan would have led to surgical intervention or other treatment that may have contributed to the decedent's recovery creates a gap in the evidence of proximate cause fatal to plaintiff's case. [Citation]. Plaintiff failed to offer evidence to a reasonable degree of medical certainty that the alleged negligent delay in administering a CT scan lessened the effectiveness of the medical treatment given to Aguilera." *Aguilera*, 293 Ill. App. 3d at 975.

This case, like *Aguilera*, turns on whether the plaintiff's experts left behind a proximate causation gap, bearing in mind "the question of whether the defendant's negligent treatment is a proximate cause of plaintiff's ultimate injury is ordinarily one of fact for the jury." *Holton*, 176 Ill. 2d at 107; see also *Suttle v. Lake Forest Hospital*, 315 Ill. App. 3d 96, 103-04, 733 N.E.2d 726 (2000).

To answer that outcome-determinative question, we turn to the testimony from Townsend's experts, Dr. Daniel Hancock (Dr. Hancock) and Dr. Bruce Leslie (Dr. Leslie).

Dr. Leslie testified Dr. Chaney deviated from the standard of care by failing to order imaging tests, which would have indicated whether Puckett had a urinary tract obstruction, and by transferring Puckett to the neurology floor, not the intensive care unit. These deviations contributed to Puckett's death.

According to Dr. Leslie, a urinary tract obstruction must be relieved: "Well, the bottom line is that if a patient has [a kidney infection] behind an obstruction, you can give industrial doses of antibiotics and you won't cure the infection. They will die of the infection." Townsend's attorney asked Dr. Leslie about Puckett's chance of survival:

"Q. Doctor, do you have an opinion as to Debra Puckett's chances of survival without the obstruction being relieved?

A. Yes, I do.

Q. And what is that opinion?

A. Zero.

* * *

Q. Now would you have expected, if Dr. Chaney had complied with the standard of care by having an [imaging test] performed, would it have been something that she would have done to actually relieve the obstruction or would that be something for her to call another type of physician?

A. She would call another type of physician, once she made the diagnosis.

Q. And do you have an opinion, Doctor, as to what her chances of survival would have been if the obstruction had been diagnosed?

A. Yes, I do.

Q. And what is that opinion?

A. 40 to 60 percent."

On cross-examination, Dr. Leslie said an imaging test would have increased Puckett's chance of survival, even if it may not have saved her life. The defendants' attorney asked Dr. Leslie about the "next step," if a test revealed a kidney stone:

"Q. *** I think you indicated, Doctor, didn't you, that whatever doctor, if it was an internist, found the stone, they would then refer it on to a specialist, is that right?

A. Yes.

Q. And what kind of specialist would that be?

A. You would have two choices. It would be either an interventional radiologist or a urologist.

Q. But if you had a patient like this, you'd involve one of those specialists, correct?

A. I probably would involve both."

Dr. Hancock testified Dr. Chaney deviated from the standard of care by failing to order an abdominal X ray, which would have ruled out a urinary tract obstruction, and by transferring Puckett to the neurology floor, rather than the intensive care unit. These deviations caused or contributed to Puckett's death.

According to Dr. Hancock, Dr. Chaney ordered appropriate

antibiotics, but she should have considered a kidney stone obstruction: "It's particularly important because antibiotics in nearly any dosage would have had very little effect in this particular situation without relieving the obstruction." Townsend's attorney asked Dr. Hancock about Puckett's chance of survival:

"Q. Doctor, what chance of survival would a patient have had in this setting with the obstruction not being diagnosed and relieved?

A. Her survivability would approach zero without having the relief of the obstruction and appropriate antibiotic treatment.

Q. And if the obstruction had been diagnosed and treated in the emergency room and relieved, what chance of survival would the patient have had at that time or appropriate therapy?

A. With relief of the ureteral obstruction and appropriate antibiotic therapy, her survival rate would have fallen somewhere between 40 and 60 percent."

On cross-examination, Dr. Hancock said, "With a certain degree of medical certainty I would say that simply increasing the antibiotic dosage that she received without relieving the obstruction of the ureter would not have provided an increased degree of survivability for her." The defendants' attorney continued:

"Q. Now, it's your opinion that had she [Dr. Chaney] ordered this test, a [kidney stone] might have been seen ***, right?

A. It might have been seen at the location of the stone of the ureter [found at Puckett's autopsy].

Q. You further testified that if it had been identified, it would require immediate attention, correct?

A. Yes.

Q. You're not the type of doctor that would provide that next intervention, are you?

A. No, that's correct.

Q. What type of doctor would do that?

A. One of two types, a urologist or an interventional radiologist.

Q. Both of which are outside your area of expertise, correct?

A. Yes."

Dr. David Chen, Townsend's physical medicine and rehabilitation expert, offered no causation opinion. But, on cross-examination, the defendants' attorney asked Dr. Chen about the treatment for kidney stones:

"Q. Doctor, had an obstructive kidney stone been diagnosed, that would have been—basically, the treatment would have gone to a surgeon; isn't that right?

A. A surgeon may have become involved, yes.

Q. The actual treatment for the kidney stone or the obstruction that needed that kind of treatment would be done by in all likelihood a urologist; isn't that right?

A. Yes.

Q. And the urologist would be the one who would be trained in determining what procedure would be best for the particular patient; isn't that true?

A. Yes."

In her testimony, Dr. Chaney agreed relieving a urinary tract obstruction is important to increase antibiotic effectiveness. Townsend's attorney asked Dr. Chaney:

"Q. Now, you wouldn't have relieved the obstruction *** yourself? It would have been your responsibility, if at all, to diagnose whether or not she did not have an obstruction, correct?

A. Yes, it's correct that I would not have relieved an obstruction.

Q. You would have called in a urologist then for that, right?

A. Somebody would have. Not necessarily me."

Considering *Aguilera*, we ask: Does this record contain any evidence to support the opinion of plaintiff's experts that the negligent delays (an imaging test or transferring Puckett to an intensive care unit) "lessened the effectiveness of treatment"? (Emphasis omitted.) *Aguilera*, 293 Ill. App. 3d at 974. Put another way, would an earlier imaging test or an earlier transfer to an intensive care unit "have led to surgical intervention or other treatment that may have contributed to the decedent's recovery"? *Aguilera*, 293 Ill. App. 3d at 975.

■ *Aguilera* stands for the proposition that proximate cause in a medical malpractice case must be established by expert testimony to a reasonable degree of medical certainty. *Susnis v. Radfar*, 317 Ill. App. 3d 817, 826-27 (2000). The causal connection must not be contingent, speculative, or merely possible. *Saxton v. Toole*, 240 Ill. App. 3d 204, 210-11, 608 N.E.2d 233 (1992). If the plaintiff fails to create a proximate cause fact issue for the jury to consider, no *prima facie* case is made and a directed verdict against the plaintiff is proper. *Wojtowicz v. Cervantes*, 284 Ill. App. 3d 524, 532, 672 N.E.2d 357 (1996).

In *Susnis*, the plaintiffs presented ample evidence that the defendant radiologist negligently failed to interpret X rays taken of the minor plaintiff. The plaintiff's expert said the doctor should have known from the chest X ray that the child's heart was enlarged. Other doctors relied on the radiologist's evaluation. Eventually, the child went into cardiac arrest and other injuries resulted. The plaintiffs contended that, had the radiologist properly interpreted the X ray, subsequent doctors would have had the opportunity to treat the child's condition and possibly avoid or minimize her injuries. We affirmed the trial judge's directed verdict in favor of the radiologist. *Susnis*, 317 Ill. App. 3d at 827. We held the mere possibility of a causal connection is not enough to sustain the burden of proving proximate cause. *Susnis*, 317 Ill. App. 3d at 827.

Plaintiff looks to *Wodziak v. Kash*, 278 Ill. App. 3d 901, 663 N.E.2d 138 (1996), for support. In that case the plaintiff's decedent went to a hospital emergency room complaining of shortness of breath. A respiratory stridor—a blocked-throat whistle—was diagnosed. The defendant doctor ordered observation, then released the patient. Two days later, after losing consciousness, the patient was taken to another hospital, where doctors discovered a tracheal obstruction. Emergency surgery followed. During the surgery the patient suffered a stroke and then developed permanent brain damage. The medical negligence complaint alleged the defendant's delay in investigating the cause of the stridor postponed treatment and was a cause of patient's injury.

We affirmed a verdict for the plaintiff. We were careful to note that plaintiff's experts testified to a specific procedure—throat dilatation—that was postponed by the negligently delayed diagnosis. That is, the delay in investigating the cause of the patient's stridor lessened the effectiveness of "definitive treatment." *Wodziak*, 278 Ill. App. 3d at 912-13. Feasibility of that treatment became a jury question.

The record in the case before us does not disclose any potential treatment for Puckett's condition, "definitive" or otherwise.

Here, Doctors Leslie and Hancock testified Puckett's chance for survival would have been enhanced had there been earlier diagnosis and treatment. They, along with Dr. Chen, said an interventional radiologist or a urologist would have provided the treatment. We can glean from the record that the treatment would have been "relief" of the obstruction. Relief of the obstruction would have improved Puckett's chance for survival.

The question before us is whether more evidence is needed before the jury is allowed to consider whether the defendants' purported negligence was a proximate cause of injury to Puckett. The defendants claim there is a fatal gap in the evidence, as there was in *Aguilera* and *Susnis*. That is, there is no evidence of what a urologist or interventional radiologist would have done to relieve the obstruction. No one said what the treatment would have been. No one said whether the right treatment was available or whether Puckett was a candidate for it, in light of her condition.

No radiologist or urologist testified in this case. We note in *Aguilera* we said a neurosurgeon was the one required to say neurosurgery should have occurred absent the defendant's negligence.

■ We conclude the jury in this case was left to speculate about proximate cause. No expert testimony guided its consideration. We do not say that no testimony by plaintiff's experts could have satisfied the causation gap. We simply hold no such evidence exists in this case. Saying her chances for survival would go from 0% to 60% if "relief"

had been provided does not address the causation gap. That kind of testimony was not enough in *Aguilera* or *Susnis* and it is not enough here. Because there was no proximate cause fact issue for the jury to consider, plaintiff failed to make out a *prima facie* case. The trial court should have granted the defendants' motion for judgment *n.o.v.*

For that reason, we vacate the jury's verdict in favor of the plaintiff and remand this cause to the trial court with directions to enter judgment in favor of the defendants. Because of our disposition of this case, there is no need to consider other issues raised by the defendants in their appeal or by the plaintiff in her cross-appeal.

Reversed and remanded with directions.

BURKE, J., concurs.

PRESIDING JUSTICE HALL, dissenting:

The majority says that there is insufficient evidence of proximate cause and that a judgment notwithstanding the verdict should have been entered in this matter. I respectfully disagree and therefore dissent from the holding of the majority.

The majority recites, yet ignores, the rigorous standard that must be met before a judgment may be entered not withstanding the verdict. While acknowledging that the issue of proximate cause is ordinarily one for the jury, the majority chooses to substitute its judgment for that of the jury in this case. When a plaintiff comes to a hospital with an existing undiagnosed medical condition, and while in the care of the hospital is negligently treated, the question of whether the defendant's negligent treatment is a proximate cause of the plaintiff's ultimate injury is ordinarily one of fact for the jury. *Holton*, 176 Ill. 2d at 107, 679 N.E.2d at 1207.

The evidence is that the plaintiff's decedent died as a result of an undiagnosed urinary tract obstruction. Doctors Leslie and Hancock testified that without the obstruction being "relieved," the decedent had a zero chance of survival. Had the obstruction been relieved, the plaintiff's decedent had a 40% to 60% chance of survival. The defendants did not remove the obstruction. The plaintiff's decedent died.

The plaintiff is critical of the failure to call in a urologist or an interventional radiologist; the failure to order abdominal tests; and the failure to transfer the plaintiff's decedent to the intensive care unit, all of which were deviations from the standard of care.

The majority opines that the jury is left to speculate about what a urologist or an interventional radiologist would have done to remove

the obstruction or what the treatment would have been. However, the instant case differs from *Aguilera* in this important respect. In *Aguilera*, the expert doctors testified that a prompt CT scan should have been ordered but that, had it been done, they did not know for sure what treatment it would have prompted without a consultation. *Aguilera*, 293 Ill. App. 3d at 974-75, 691 N.E.2d at 6. In the instant case, Doctors Leslie and Hancock testified that the obstruction had to be relieved for the plaintiff's decedent to have a chance of survival. Their testimony that another doctor would have been called upon to perform the relief of the obstruction does not, as in *Aguilera*, fail to establish a basis for their opinions of proximate cause. The *Aguilera* experts did not know if surgical intervention should have been done even if the CT scan been done earlier; the experts in this case knew and testified what needed to be done to save the plaintiff's decedent: the obstruction had to be relieved.

*Susnis*, also relied on by the majority, is equally distinguishable from the instant case. In that case, the medical experts presented no evidence linking the alleged deviations from the standard of care to the injuries suffered by the infant. *Susnis*, 317 Ill. App. 3d at 827. In the instant case, the medical experts testified that, had the plaintiff's decedent been properly diagnosed and the obstruction relieved, she could have survived.

I do not believe that evidence as to the specific type of treatment which would have been used to relieve the obstruction is necessary to allow a jury to determine that a failure to render any treatment to relieve the obstruction is a proximate cause of the injury and subsequent death of the plaintiff's decedent. This is not a speculative "leap of faith" that the jury would be required to make, rather a conclusion drawn from the facts presented by the expert evidence.

The jury is charged to determine, from the facts, proximate cause based upon the expert evidence. *Holton*, 176 Ill. 2d at 106-11, 679 N.E.2d at 1207-09; *Suttle v. Lake Forest Hospital*, 315 Ill. App. 3d 96, 733 N.E.2d.726 (2000). The jury in this case met its responsibility. We should not abrogate its verdict by requiring a multicolored road map when a simple black line will do.