JENNIFER SIMMONS *et al.*, Indiv. and as Co-Special Adm'rs of the Estate of LaTonya King, Deceased, Plaintiffs-Appellants, v. ROLANDO M. GARCES, Defendant-Appellee.

First District (3rd Division)    No. 1—00—0651

Opinion filed February 7, 2001.

Michael Gill, of Bruce R. Pfaff & Associates, Ltd., of Chicago, for appellants.

Michael A. Pollard and Mark L. Karasik, both of Baker & McKenzie, of Chicago, for appellee.

JUSTICE WOLFSON delivered the opinion of the court:

The dominant question in this case is whether the jury's answer to a special interrogatory trumped its general verdict in favor of the plaintiffs. The trial court said it did. We agree.

Plaintiffs, Jennifer Simmons (Jennifer) and Harold King, individually and as co-special administrators of the estate of their daughter, LaTonya King (LaTonya), brought a medical malpractice action against defendant, Dr. Rolando M. Garces. A jury returned a general verdict in favor of plaintiffs and against defendant in the amount of $675,000. In addition, the jury answered "No" to the special interrogatory: "Did dehydration contribute to cause the death of LaTonya King?" In response to defendant's posttrial motion, the trial court entered judgment in favor of defendant on the special interrogatory. 735 ILCS 5/2—1108 (West 1998).

Plaintiffs contend on appeal the court erred in entering judgment on the special interrogatory. Plaintiffs also contend they were prejudiced by defense counsel's misconduct, errors in the admission or refusal of evidence, and the court's refusal to give a requested missing-evidence jury instruction. We affirm.

FACTS

Dr. Garces operated a first-come-first-served clinic from 10 a.m. to 5 p.m. Sharon Robinson Booker (Sharon), a medical assistant, and Shalonda Sloan Martin (Shalonda), a receptionist, assisted Dr. Garces. Patients would sign in and be called in order but would be called out of order if they had an emergency situation. If a parent insisted that her child was very ill, the assistants were instructed to call Dr. Garces immediately.

Jennifer brought LaTonya to the clinic for the first time on January 21, 1993. Dr. Garces pronounced LaTonya to be a perfectly healthy baby.

Jennifer testified LaTonya took four ounces of formula at 5 p.m. on January 23 and again at 9 or 10 p.m. She denied LaTonya took four ounces of formula at 6 a.m. on January 24, but she was impeached with her prior deposition testimony to the contrary. Jennifer also testified LaTonya took two more ounces of fluid at 8:30 a.m. and another half ounce before noon on January 24. Jennifer acknowledged LaTonya had only one bowel movement on the morning of January 24, none the night before. During the last 24 hours of her life, LaTonya was not sweating or vomiting.

On January 24, Jennifer called Dr. Garces at 10 a.m. and said LaTonya had diarrhea and was not taking her formula. Dr. Garces told Jennifer to give LaTonya Pedialyte and to come in if the problem persisted.

Jennifer testified when LaTonya refused the Pedialyte, she dressed her warmly and walked to the clinic at 1 p.m. According to Jennifer, Shalonda went to speak with Dr. Garces and then told Jennifer Dr. Garces wanted her to get Pedialyte from a drug store. Shalonda and Sharon testified Jennifer signed in but left the clinic on her own without waiting to be seen. Jennifer returned home and tried again to get LaTonya to drink.

Jennifer said she called 911 at 2:20 p.m. and explained LaTonya's symptoms. The 911 operator told her she should contact her pediatrician. She called the clinic again several times during the day but did not speak to Dr. Garces.

At 3:56 p.m., Dr. Garces spoke to Jennifer again when she called to say LaTonya was not drinking. He told her to try a different formula. If LaTonya would not take that formula, Jennifer was to take her to the emergency room because she might get dehydrated.

Jennifer said she called a taxi about 4:13 p.m., dressed LaTonya as she had when she took her to the clinic, and waited inside her apartment for the taxi to arrive. She said she took the taxi to the hospital.

At 4:40 p.m. Jennifer arrived at South Shore Hospital with

LaTonya. LaTonya was not breathing. Dr. Thomas Bakh and nurses Myrna Carating and Marcel Parungao tried unsuccessfully to resuscitate LaTonya. She was pronounced dead at 5:06 p.m. Emergency room staff recorded LaTonya's rectal temperature of 93.2 degrees and weight of 5 pounds 8 ounces. They also noted Jennifer's statement that LaTonya was "active at 2:30" and immediately prior to their arrival in the emergency room "infant stiffened, arms stretched, and neck hyperextended."

Officers Charles Howard, Jr., and his partner, Paul Anderson, went to the hospital emergency room to investigate the death. Officer Howard testified he prepared a report stating Jennifer had walked to the hospital. The report was not signed by a supervisor. Officer Anderson testified, "It was my recollection that [Jennifer] walked to the hospital according to her."

Detective David Friel and his partner Detective McMurray arrived at the hospital between 5 p.m. and 6 p.m. to investigate the death. They interviewed LaTonya's parents and hospital staff members. Detective Friel testified Jennifer told him she arrived at the emergency room by taxi. He identified a report Detective McMurray prepared at the time documenting what they learned. They closed the investigation having determined there was no apparent criminal wrongdoing.

Dr. Tae Lyong An, a Cook County forensic pathologist, performed an autopsy and determined the cause of death was "dehydration due to gastroenteritis." Dr. An defined gastroenteritis as an inflammation of the stomach and the small intestine. He acknowledged finding no anatomic or pathologic evidence of an inflammation in the stomach or small intestine consistent with gastroenteritis. But he explained even if not anatomically found, "it can cause diarrhea, so we say—we call it gastroenteritis. That's nothing unusual." Three other Cook County pathologists reviewing his opinion agreed.

Dr. An stated he did not believe there was evidence of hypothermia. He had evidence Jennifer took LaTonya to the hospital by taxi and did not remember any information that Jennifer walked. But he did not think the information was significant.

Plaintiffs presented the expert testimony of Dr. Gilbert Given, a board-certified pediatrician, to establish defendant deviated from the standard of care and his negligent conduct resulted in LaTonya's death by dehydration.

Dr. Given testified the standard of care for Dr. Garces is the same as that for a board-certified pediatrician. In Dr. Given's opinion, Dr. Garces deviated from that standard of care by failing to examine LaTonya when she was brought to the clinic, failing to take Jennifer's

phone calls, and failing to refer LaTonya to another physician or hospital.

Dr. Given said dehydration is a loss of body fluids which can cause death. The severity of dehydration is determined by weight loss after the illness begins. Mild dehydration is generally not life-threatening. However, in severe dehydration a child's circulation and blood pressure become involved. Appropriate treatment is hospitalization and administration of IV fluids.

In Dr. Given's opinion, LaTonya was severely dehydrated (12% to 14%) based on the weight at autopsy (5 pounds) compared with the weight on January 21 (5 pounds 12 ounces) and the reports describing sunken eyes and dehydrated skin. He acknowledged if he used the weight recorded at the emergency room (5 pounds 8 ounces) to calculate the percentage of weight loss, only mild dehydration would be shown. He was asked:

"Q. Doctor, do you have an opinion as to the mechanism of LaTonya's death?

A. I believe she was severely dehydrated and this contributed to her death."

The appropriate treatment, he said, would have been hospitalization and IV fluids: "I think more likely than not if Dr. Garces had intervened with appropriate IV fluids that she would not have died."

Dr. Given was asked on direct examination about inconsistencies in evidence he had reviewed. Dr. Given said, "Oh, there were just numerous in terms of what was said, what wasn't said, who said what. Even to the point of how the baby got to the hospital. It was noted by the officer that the mom took a cab. Someone else noted that the mom walked. There were just a lot of inconsistencies."

On cross-examination, Dr. Given said there was no evidence of acute tubular necrosis in the kidneys consistent with severe dehydration. He was extensively cross-examined on the lack of evidence in Dr. An's autopsy report to support a conclusion of death by dehydration. He acknowledged the emergency room record stated LaTonya was active and alert at 2:30 p.m.

Dr. Given agreed the physical signs of death by hypothermia are an absence of heartbeat and a cold body, and both were present in this case. Counsel elicited this response from Dr. Given: "Based on review of the complete record, I would suspect that this child had—was dehydrated. How dehydrated the child, the baby, was, I don't know."

Dr. Garces denied any negligence and denied that any claimed act or omission on his part was a proximate cause of plaintiffs' claimed injuries. He presented expert testimony to establish LaTonya's death was not caused by dehydration but occurred from either of two other

causes: hypothermia or accidental suffocation. No one testified either of those two other possible causes was related to Dr. Garces' purported negligence.

Dr. Michael Kaufman, certified in anatomic pathology and cytopathology, testified in his opinion hypothermia was the cause of death. He explained hypothermia causes death if it is of a significant enough degree to alter normal body metabolism to create an abnormal heart rhythm or systole, a total stoppage of the heart impulse. Dr. Kaufman noted the emergency room report of how LaTonya had been clothed, her cold skin, and a "markedly" low rectal temperature of 93.2 degrees. He believed the mechanism of death was a terminal arrhythmia which "may have caused the seizure, but clearly it caused the heart just to stop."

Dr. Kaufman also noted the "possibility" of death by suffocation. He noted petechia, or bleeding, in the lungs.

Dr. Kaufman found no significant evidence in the medical records showing LaTonya had significant dehydration or died of dehydration. He noted the "gross and microscopic findings of a lack of gastroenteritis" in Dr. An's autopsy report. Comparing LaTonya's weight on January 21 and weight postmortem in the emergency room, the weight loss was only 4.4%, an insignificant percentage. In addition, laboratory tests for urea nitrogen, creatinine, and sodium were inconsistent with significant dehydration. Dr. Kaufman viewed the basis of the autopsy findings of dehydration as merely consistent with a lack of subcutaneous body fat.

Dr. William Wittert, a board-certified pediatrician and a fellow of the American College of Forensic Examiners, also testified for the defense. In his opinion, Dr. Garces possessed the skill and met the standard of care of reasonably well-trained and qualified practitioners practicing in the same or similar circumstances. He said, "I believe that nothing he did caused harm to Latonya King."

Dr. Wittert also said, "This child did not die from dehydration." The reports of LaTonya's fluid intake from the evening of January 23 through the morning of January 24 and the output (one loose stool) were inconsistent with dehydration. Dr. Wittert calculated weight loss as 4.3%, which would not be life-threatening. He stated even a 7% to 10% weight loss should not cause a baby to die of dehydration.

Dr. Wittert said he did not have an opinion to a reasonable degree of medical certainty why LaTonya died. In his opinion, a contributing factor of death was LaTonya's "very low" temperature. He also stated, "this baby could have been suffocated or asphyxiated."

The jury was instructed on plaintiffs' contentions as follows: Dr. Garces was negligent on the day of LaTonya's death by (a) failing to

examine LaTonya after Jennifer brought her to the clinic despite symptoms of diarrhea, drowsiness and inability to suck; (b) failing to follow up by taking phone calls from Jennifer despite LaTonya's symptoms; (c) failing to refer LaTonya to a physician or hospital for examination, diagnosis, or IV treatment despite her symptoms; or (d) permitting his staff to provide inappropriate medical advice or decisions over the phone. The jury was instructed it must not decide the question from any personal knowledge but only from expert testimony.

The court agreed to give plaintiffs' instruction on causation, which stated:

> "When I use the expression 'proximate cause,' I mean any cause which, in natural or probable sequence, produced the injury complained of. It need not be the only cause, nor the last or nearest cause. It is sufficient if it concurs with some other cause acting at the same time, which in combination with it, causes the injury." Illinois Pattern Jury Instructions, Civil, No. 15.01 (3d ed. 1995).

Dr. Garces argued the jury had to determine what caused LaTonya's death because if she did not die of dehydration, there was no support for a verdict for plaintiffs. Defendant proposed the special interrogatory: "Did LaTonya King die of dehydration?"

Plaintiffs' attorney objected, saying, "[I]n light of the fact that this jury, who's heard lots of evidence based on the size, the age, lots of different things, it would be very prejudicial to the plaintiff to try to make it very narrow, because they may think that a combination of some of the heart stopping because of her age, in addition to the dehydration and the stresses of her environment."

The court asked, "What if they think it's suffocation?"

Plaintiffs' attorney answered, "Well, if they think it's suffocation, there's been no testimony from the plaintiffs that suffocation would make the doctor responsible, so they wouldn't even get to this. They would be on verdict form B [in favor of defendant]." He further stated that the jury might conclude the baby was dehydrated, "that it did contribute to her being in a diminished state because of her age or something or because she's a premature child her heart stopped." He concluded it would be prejudicial to tender the interrogatory "when we have all this testimony, particularly when my expert on liability says it's a contributing cause."

Defendant's attorney argued if the jury determined dehydration was not involved in LaTonya's death, Dr. Garces could not be liable because "That's their whole case."

The court suggested the more appropriate question, which would test the verdict, would be: "Did dehydration contribute to cause the death of LaTonya King?" The court gave the instruction over plaintiffs' objection.

After the jury began deliberating, it sent out a note asking three questions:

> "(1) If we have already decided on Form A or Form B, what is the purpose of the dehydration form?
>
> (2) Is the dehydration form mandatory?
>
> (3) Do we have to be unanimous on the dehydration form?"

The court answered the first question, "It is the law," and answered the second and third questions, "Yes."

A short time later, the jury returned its verdict in favor of plaintiffs and the signed special interrogatory answered in the negative. Defense counsel moved for entry of judgment in favor of Dr. Garces on the basis of the inconsistency.

The court delayed entering judgment and set a briefing schedule. The court subsequently entered judgment on the special finding in favor of defendant and also denied plaintiffs' motion for a new trial.

### DECISION

The Special Interrogatory

Plaintiffs contend on appeal the court erred in entering judgment on the special interrogatory because the special finding was not absolutely irreconcilable with the general verdict. They also contend the special interrogatory was not in proper form and confused the jury, and the jury's answer was against the manifest weight of the evidence.

■ Section 2—1108 of the Code of Civil Procedure provides:

> "Unless the nature of the case requires otherwise, the jury shall render a general verdict. The jury may be required by the court, and must be required on request of any party, to find specially upon any material question or questions of fact submitted to the jury in writing. Special interrogatories shall be tendered, objected to, ruled upon and submitted to the jury as in the case of instructions. Submitting or refusing to submit a question of fact to the jury may be reviewed on appeal, as a ruling on a question of law. When the special finding of fact is inconsistent with the general verdict, the former controls the latter and the court may enter judgment accordingly." 735 ILCS 5/2—1108 (West 1998).

If a special interrogatory is inconsistent with the general verdict, the special interrogatory controls. *LaPook v. City of Chicago*, 211 Ill. App. 3d 856, 865, 570 N.E.2d 708 (1991). But if the special interrogatory does not cover all issues submitted to the jury and a "reasonable hypothesis" exists to allow the special finding to be construed consistently with the general verdict, they are not "absolutely irreconcil-

able" and the special finding will not control. *LaPook*, 211 Ill. App. 3d at 865.

■ All reasonable presumptions must be exercised in favor of the general verdict. *Bilderback v. Admiral Co.*, 227 Ill. App. 3d 268, 270, 591 N.E.2d 36 (1992) (interrogatories were ambiguous and concerned interlocutory rather than ultimate facts, and the general verdict addressed an issue not determined by special findings); accord *Kessling v. United States Cheerleaders Ass'n*, 274 Ill. App. 3d 776, 779-80, 655 N.E.2d 926 (1995) (special finding that both the plaintiff and defendant were the proximate cause of the plaintiff's injuries was reconciled with general verdict for the defendant on inference jury found the plaintiff at least 51% negligent and entitled to no recovery).

In this case, plaintiffs' entire case was premised on the theory Dr. Garces' negligence caused LaTonya's death by allowing her to become severely dehydrated.

■ To prevail, plaintiffs had to establish a standard of care, defendant's deviation from that standard, and a causal connection between the deviation and the injury sustained. *Evanston Hospital v. Crane*, 254 Ill. App. 3d 435, 441, 627 N.E.2d 29 (1993).

Proximate cause must be established by expert testimony to a reasonable degree of medical certainty. *Aguilera v. Mount Sinai Hospital Medical Center*, 293 Ill. App. 3d 967, 972, 691 N.E.2d 1 (1997); accord *Townsend v. University of Chicago Hospitals*, 318 Ill. App. 3d 406, 413 (2000). "The causal connection must not be contingent, speculative, or merely possible." *Townsend*, 318 Ill. App. 3d at 413. "If the plaintiff fails to create a proximate cause fact issue for the jury to consider, no *prima facie* case is made ***." *Townsend*, 318 Ill. App. 3d at 413.

●4 Plaintiffs presented the testimony of one expert, Dr. Given. Dr. Given established defendant's deviation from the standard of care. Dr. Given testified dehydration caused or at least contributed to cause LaTonya's death. In his opinion, LaTonya was dehydrated when Jennifer brought her to the clinic at 1 p.m. LaTonya would not have died if Dr. Garces had diagnosed her symptoms of dehydration and intervened with IV fluids.

Plaintiffs presented no expert testimony to establish any other causation of death but dehydration. Moreover, plaintiffs' attorney in closing argument disputed any other theory of death presented by defendant's experts. He argued the evidence established "dehydration did contribute to cause the death of LaTonya" and if the jury found that dehydration did contribute, it had no choice in how to answer the question asked in the special interrogatory; it had to say "yes."

When the jury was asked to focus its attention on the particularized question of whether dehydration contributed to cause LaTonya's

death, it answered "No." Plaintiffs' attempt to establish a causal connection between defendant's negligence and LaTonya's death then failed for lack of expert testimony.

Unlike the cases on which plaintiffs rely, there is no reasonable hypothesis remaining on which to reconcile the jury's answer to the special interrogatory with the general verdict. The trial court properly entered judgment on the special interrogatory.

Plaintiffs also contend the interrogatory should not have been given because it was confusing and not in proper form. We disagree.

■ A special interrogatory may not ask for a finding on a "mere evidentiary fact" but must address a material question of fact, defined as "an ultimate fact upon which the rights of the parties depend." *Meister v. Henson*, 253 Ill. App. 3d 619, 628, 625 N.E.2d 404 (1993).

A special interrogatory is in proper form if it is a single question, it relates to an ultimate issue of material fact that would control an inconsistent general verdict, its terms are simple, unambiguous, and understandable, and it is not repetitive or confusing. *Snyder v. Curran Township*, 281 Ill. App. 3d 56, 61, 666 N.E.2d 818 (1996); see also *Eaves v. Hyster Co.*, 244 Ill. App. 3d 260, 265-66, 614 N.E.2d 214 (1993) (in proper form if either a positive or negative answer could test some general verdict); *Gasbarra v. St. James Hospital*, 85 Ill. App. 3d 32, 38, 406 N.E.2d 544 (1979) (to be in proper form, a responsive answer must be inconsistent with some general verdict that might be returned).

■ Special interrogatories are considered in light of the court's other instructions to the jury to determine how it was understood and whether the jury was confused. *LaPook*, 211 Ill. App. 3d at 866.

A special interrogatory need not contain all elements of negligence and is proper if it focuses on one element dispositive of the claim. *Snyder*, 281 Ill. App. 3d at 61-62.

The special interrogatory here asked a single question. It related to an ultimate issue of material fact regarding cause of death. See *Costa v. Dresser Industries, Inc.*, 268 Ill. App. 3d 1, 11, 642 N.E.2d 898 (1994).

In *Costa*, the plaintiff's entire case was premised on a claim the decedent died of mesothelioma as a result of exposure to asbestos. The defense asserted the plaintiff died of another cause unrelated to asbestos exposure. The special interrogatory asked simply: "Do you find that Dominic Costa died from the disease of mesothelioma?" 268 Ill. App. 3d at 11. The court in *Costa* found the special interrogatory was proper because a negative answer would dispose of the plaintiff's claim. *Costa*, 268 Ill. App. 3d at 11.

As in *Costa*, the special interrogatory in this case asked a single

question of ultimate fact that was dispositive of plaintiffs' claim defendant's negligent failures to act caused LaTonya's death by dehydration.

We see a strong resemblance between the special interrogatory in this case and the question asked in *Bluestein v. Upjohn Co.*, 102 Ill. App. 3d 672, 430 N.E.2d 580 (1981). In *Bluestein*, the plaintiff's expert testified the defendant's product, Cleocin, caused grave damage to the plaintiff. Upjohn's experts said Cleocin did not harm the plaintiff. The jury was asked: "Was Cleocin a proximate cause of the injuries claimed by Stuart Bluestein?" 102 Ill. App. 3d at 673. The jury returned a substantial general verdict for the plaintiff, but answered "no" to the special interrogatory, causing the trial judge to enter judgment in Upjohn's favor. The court affirmed the trial judge, saying: "Very simply, the jury's answer reflected their acceptance of Upjohn's argument that the plaintiff was suffering from a disease that was completely unrelated to his ingestion of Cleocin." *Bluestein*, 102 Ill. App. 3d at 676.

In *Bluestein*, as in this case, the special interrogatory did not address every issue. It addressed the hotly contested ultimate fact on which liability could turn: whether the defendant's product (here, read negligence) was a proximate cause of the plaintiff's injury.

■ The terms of the special interrogatory in this case were clearly understandable and not confusing. Initially, commonly used words need not be defined by the court in jury instructions. *LaPook*, 211 Ill. App. 3d at 865-66. Moreover, although the court did not define the term "dehydration," dehydration was extensively discussed and defined through expert testimony. The jury did not consider the special interrogatory without having heard extensive testimony on the subject. It was Dr. Given who twice told the jury Dr. Garces' negligent conduct caused LaTonya's dehydration, which "contributed" to her death.

Nor did the jury's questions reflect any confusion. The questions regarded procedure. The jury did not appear confused about the actual question posed in the special interrogatory.

When considered with the other instructions regarding proximate cause (any concurring cause), there is no reason to conclude the jury was confused by the special interrogatory. It was in proper form and acted as a proper check on the ultimate issue of causation. See *LaPook*, 211 Ill. App. 3d at 865-67.

■ Plaintiffs also contend the special finding was against the manifest weight of the evidence.

To prevail, plaintiffs must establish the opposite conclusion was clearly evident or the special finding was unreasonable and not based on any evidence. *Morton v. City of Chicago*, 286 Ill. App. 3d 444, 452, 676 N.E.2d 985 (1997).

The testimony of defendant's experts provided substantial evidence that LaTonya did not die from dehydration.

Dr. Kaufman testified there was no significant evidence showing LaTonya died of dehydration. The gross and microscopic findings in the autopsy report provided no evidence of gastroenteritis, which would result in dehydration. Other reported laboratory tests for urea nitrogen, creatinine, and sodium were absolutely inconsistent with significant dehydration. Moreover, LaTonya's weight loss from January 21 to January 24 was only 4.4%, an insignificant percentage. Dr. Kaufman believed the autopsy finding based on poor skin turgor and sunken eyes was mistaken. He noted LaTonya's premature birth and low weight and explained those findings as consistent with a lack of subcutaneous body fat.

Moreover, his testimony provided an alternate cause of death, hypothermia, unrelated to defendant's alleged negligence. The conclusion LaTonya died of hypothermia was supported by her low rectal temperature of 93.2 degrees and the way she was clothed and wrapped on arrival at the emergency room. Dr. Kaufman believed hypothermia resulted in an arrhythmia which caused her heart to stop beating.

Dr. Wittert stated unequivocally, "This baby did not die from dehydration." He testified LaTonya's fluid intake and output and her percentage of weight loss were inconsistent with dehydration.

The jury had ample expert evidence on which to conclude dehydration did not contribute to cause LaTonya's death. The special finding was supported by sufficient evidence. The court correctly determined the special finding was not against the manifest weight of the evidence and, based on the answer regarding causation, properly entered judgment in favor of defendant. *Borries v. Z. Frank, Inc.*, 37 Ill. 2d 263, 265-67, 226 N.E.2d 16 (1967); *LaPook*, 211 Ill. App. 3d at 868-69.

Other Issues

■ Plaintiffs also contend they were denied a fair trial by the misconduct of defense counsel, certain evidentiary rulings, and the court's refusal to give a missing evidence instruction.

This case was vigorously tried on both sides. Defendant's counsel objected to certain terminology employed by plaintiffs' attorney, as well, and also moved unsuccessfully for a mistrial several times based on alleged errors prejudicial to defendant.

A review of the record establishes plaintiffs were not unfairly prejudiced. Any error that might have occurred did not affect the outcome of the case. That is, the purported trial errors had little or no bearing on the question posed by the special interrogatory. The jury returned a general verdict for $675,000 in plaintiffs' favor. Their right

to a fair trial was not seriously prejudiced. See *McDonnell v. McPartlin*, 192 Ill. 2d 505, 535, 736 N.E.2d 1074 (2000); *Nilsson v. NBD Bank*, 313 Ill. App. 3d 751, 760, 731 N.E.2d 774 (1999).

We briefly set out plaintiffs' contentions.

(1) Plaintiffs contend defense counsel demeaned the requirement for bringing suit, fibbed about defendant requesting a jury trial, exaggerated plaintiffs' burden, and made improper pleas for sympathy. Defendant correctly notes plaintiffs fail to cite authority to show the challenged comments were improper (134 Ill. 2d R. 341(e)(7)), waived many of the errors by failing to object in a timely manner (*Diaz v. Kelley*, 275 Ill. App. 3d 1058, 1072, 657 N.E.2d 657 (1995)), or failed to specify the basis of the objection. A number of other objections were sustained, curing any error. The jury was properly instructed that arguments, statements, and remarks of counsel were not evidence.

(2) Plaintiffs filed a motion *in limine* to bar evidence as to whether Jennifer took a taxi or walked to the emergency room. They argued there was apparently contradictory evidence on the issue, defendant's experts said it was irrelevant to their opinions, and it was a collateral issue. Defendant argued it was relevant to Jennifer's credibility and said Jennifer told the emergency room nurse and the initial investigating officers she walked. Later that same day, she told detectives she took a taxi.

Plaintiffs did not object when Dr. An testified he received information Jennifer arrived at the hospital by taxi and did not remember any information she walked. Because plaintiffs' motion *in limine* was denied and they failed to object when the information was introduced, they waived the issue for review. *Brown v. Baker*, 284 Ill. App. 3d 401, 406, 672 N.E.2d 69 (1996).

In fact, plaintiffs' counsel elicited Dr. Given's testimony on the issue during direct examination. Dr. Given testified as to the inconsistency regarding how the baby arrived at the hospital. He noted one officer said she arrived by cab but someone else said she walked. Having failed to object at trial and having introduced the evidence themselves, plaintiffs cannot now complain of error. *Reid v. Sledge*, 224 Ill. App. 3d 817, 822, 587 N.E.2d 1156 (1992).

(3) The court properly refused to strike any testimony in the record that could have implied Jennifer was negligent. A defendant is always free to offer evidence that its conduct, negligent or not, was not a proximate cause of the injury. *McDonnell*, 192 Ill. 2d at 520-21. No contributory negligence claim went to the jury. The defense did not contend plaintiffs were contributorily negligent.

(4) Finally, the trial court did not abuse its discretion when it refused to give plaintiffs' tendered "missing evidence" jury instruc-

tion, which would have allowed the jury to draw a negative inference from defendant's failure to produce a temporary record of LaTonya's height and weight on January 24. See Illinois Pattern Jury Instructions, Civil, No. 5.01 (3d ed. 1995). The instruction is warranted only if there was no reasonable excuse for failure to produce the evidence. *Brown v. Moawad*, 211 Ill. App. 3d 516, 531, 570 N.E.2d 490 (1991). In this case, there was a reasonable explanation provided by defendant. LaTonya's chart was out of the office for billing. When height and weight were recorded on a temporary chart, office policy mandated saving it only when Dr. Garces saw the patient. Otherwise, it was discarded. Dr. Garces did not see LaTonya on January 24.

## CONCLUSION

The special interrogatory was in proper form, was not confusing or misleading, and was not against the manifest weight of the evidence. The jury's answer to the question posed was absolutely irreconcilable with the general verdict. The trial court properly entered judgment in favor of defendant. Plaintiffs received a fair trial free from unfair prejudice as evidenced by the jury's general verdict in their favor.

Affirmed.

BURKE, J., concurs.

PRESIDING JUSTICE HALL, dissenting:

I respectfully dissent from the majority opinion in this case because I am of the opinion that the answer to the special interrogatory can be reconciled to the jury's general verdict in this case. Moreover, I disagree with the majority's statement that the plaintiffs' entire case was premised on the theory that Dr. Garces' negligence caused LaTonya's death by allowing her to become severely dehydrated.

In a medical malpractice case, Illinois law mandates that the plaintiff prove: (1) the proper standard of care by which to measure the defendant's conduct, (2) a negligent breach of the standard of care, and (3) resulting injury proximately caused by the defendant's lack of skill or care. *Suttle v. Lake Forest Hospital*, 315 Ill. App. 3d 96, 102, 733 N. E. 2d 726, 731 (2000). It is the plaintiff's duty to present expert testimony to establish the above requirements. *Suttle*, 315 Ill. App. 3d at 102-103, 733 N.E.2d at 731.

If the plaintiffs had based their entire claim against Dr. Garces on his failure to diagnose and treat LaTonya for dehydration, I would agree with the majority that a finding by the jury that dehydration did

not contribute to LaTonya's death, would be irreconcilable with a jury verdict for the plaintiffs in this case. However, based on the expert testimony in this case, regardless of whether LaTonya died of dehydration, hypothermia or suffocation, the jury could have found that Dr. Garces' actions or failure to act proximately caused LaTonya's death.

The jury was instructed that the plaintiffs claimed that Dr. Garces was negligent in one or more of the following respects:

> "a. Failed to examine LaTonya King after being brought to the clinic by the mother on January 24, 1994, when he knew or should known that LaTonya King has symptoms of diarrhea, drowsiness and the inability to suck; or
>
> b. Failed to follow up by taking phone calls from Jennifer Simmons, when he knew or should have known that LaTonya King had symptoms of diarrhea, drowsiness and the inability to suck; or
>
> c. Failed to refer LaTonya King to a physician or hospital for examination, diagnosis, or IV treatment when he knew or should have known that LaTonya King had symptoms of diarrhea, drowsiness and the inability to suck; or
>
> d. Permitted his staff to provide inappropriate medical advice or decisions over the phone."

None of the plaintiffs' allegations of negligence mention "dehydration" or indeed any specific cause of death. Rather, the plaintiffs' allegations center around Dr. Garces' failure to provide follow-up care to LaTonya based upon the symptoms she was displaying, regardless of what disease or condition she was suffering from.

Dr. Givens, the plaintiffs' expert witness, testified that, having initiated treatment of LaTonya, the standard of care required Dr. Garces to follow up that treatment. In Dr. Givens' opinion, Dr. Garces violated the standard of care when he did not examine LaTonya after he was informed that she was not responding to recommended therapy, when he did not speak to Jennifer when she called because LaTonya was getting worse, by allowing his staff to advise Jennifer to force LaTonya to take the Pedialyte instead of letting Jennifer speak directly to Dr. Garces, and when he did not make arrangements for LaTonya to be seen by another medical professional.

When asked if the above negligent acts were a proximate cause of LaTonya's death, Dr. Givens opined, with a reasonable degree of medical certainty, that they were because

> "based upon on history and the findings at the autopsy, that [Dr. Garces'] failure to see her and intervene contributed to her death."

*In addition*, Dr. Givens opined that had Dr. Garces intervened with appropriate IV fluids, LaTonya would not have died.

Under the proximate cause instruction that the jury received in this case, in order to find Dr. Garces' failure to follow up treatment

with LaTonya was the proximate cause of her death, the jury was not required to find that the failure to do so was the only cause and that it would be sufficient if his acts or failure to act in combination with another cause resulted in her death. Therefore, regardless of the ultimate cause of LaTonya's death, the jury could have concluded that had Dr. Garces followed up on LaTonya's care and treatment, she would not have died.

Thus, the jury's answer to the special interrogatory that dehydration did not contribute to LaTonya's death did not reflect the jury's belief that Dr. Garces' actions were not a proximate cause of LaTonya's death. The jury merely rejected the premise that dehydration contributed to LaTonya's death. Under the evidence in this case, the jury could determine that dehydration did not contribute to LaTonya's death and still find that Dr. Garces' failure, once having undertaken to treat her, to follow up the treatment for what she ultimately died of was a proximate cause of her death.

The cases relied on by the majority are distinguishable. In *Costa*, the plaintiff's entire case was based upon the fact that the decedent died from mesothelioma and, therefore, the jury's finding pursuant to a special interrogatory that the decedent did not die from mesothelioma was irreconcilable with the jury's general verdict for the plaintiff. In *Bluestein*, all of the plaintiff's theories of recovery required that the jury find that the drug Cleocin caused or was part of the cause of the plaintiff's injury. Thus, the jury's determination that Cleocin was not a proximate cause of the plaintiff's injury could not be reconciled with the jury's general verdict for the plaintiff.

However, in this case, the plaintiffs' entire case was not based upon dehydration having contributed to LaTonya's death. Whatever the cause of death, it was Dr. Garces' failure to follow up treatment which contributed to her death.

As I am of the opinion that the jury's determination that dehydration did not contribute to LaTonya's death was not inconsistent with the jury's general verdict for the plaintiffs, I respectfully dissent.